REVISED, March 31, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-40546
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BALTAZAR SAENZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

February 2, 1998

Before DeMOSS and DENNIS, Circuit Judges, and ROSENTHAL[*],

District Judge.

PER CURIAM:

Defendant-appellant Baltazar Saenz was convicted
following a jury trial on one count of conspiracy to possess with
the intent to distribute a quantity in excess of 100 kilograms of
marijuana, and one count of possession with the intent to
distribute approximately 1,185 pounds of marijuana.

_____

[*] District Judge of the Southern District of Texas, sitting by
designation.

The primary basis for Saenz's challenge to his conviction is that the district court deprived him of a fair trial by questioning witnesses in a manner and to a degree that made the court appear to be partial to the prosecution.[1]  Saenz argues that the district court's questions of the chief prosecution witness and of the defendant confused the jury as to the court's function and led the jury to believe that the court favored the prosecution's case.  The government responds that the court was merely attempting to clarify fact issues for the jury and that it did not create an appearance of favoring the prosecution's case.

We hold that under the unusual combination of circumstances present here, the cumulative effect of the trial court's questions deprived Saenz of a fair trial.  We reverse and remand for a new trial.

I.    Factual Background

In late 1994 and early 1995, the United States Customs Service ("Customs") office in Brownsville, Texas began an undercover sting operation designed to identify marijuana traffickers.  Customs suspected Israel Soto-Zamarano ("Soto") of running a drug trafficking organization.  Customs planned to have an undercover agent pose as a truck driver and offer to transport a large shipment of marijuana for Soto.  The goal was not to make

---

[1]    Saenz also asserts that the government made prejudicial and inflammatory remarks that deprived Saenz of a fair trial; the district court improperly charged the jury; and the government presented insufficient evidence to convict Saenz of possession of marijuana with intent to distribute.  This court does not reach these grounds.

2

immediate arrests, but to identify other suspected traffickers and expand the investigation.

An undercover Customs agent established contact with Soto as planned. Soto arranged to deliver approximately 1,185 pounds of marijuana to the undercover agent in Brownsville on February 8, 1995, for shipment to the Tampa, Florida area. Israel Soto's brother, Ernesto Soto, was to receive the marijuana in the Tampa, Florida area. Israel Soto gave the agent a Florida telephone number for Ernesto Soto. Israel Soto intended to travel to Florida to oversee the delivery of the marijuana to his brother. However, on February 9, 1995, Israel Soto was arrested in Brownsville on an unrelated charge of weapons possession and incarcerated in the Cameron County jail. Customs agents found Baltazar Saenz's name and telephone number on a piece of paper in Israel Soto's wallet.

Despite Israel Soto's arrest, Customs proceeded with the marijuana delivery as planned. Customs flew the marijuana to Tampa. The delivery to Ernesto Soto was scheduled to occur at 6:00 p.m. on February 14, 1995, in a motel parking lot in Wesley Chapel, Florida. At 3:00 p.m. that day, a Customs agent conducting surveillance of the motel parking lot saw a white-paneled "bobtail" truck and a beige, wood-paneled Jeep Cherokee pull into the motel parking lot. The agent described the maneuvers he observed as "counter-surveillance" measures. The Jeep left the parking lot at approximately 3:45 p.m. The agent saw four people in the Jeep but could not identify them at that time.

Later that afternoon, an undercover Cameron County deputy sheriff, Abraham Rodriguez, met Ernesto Soto in a motel room in Wesley Chapel, Florida. Rodriguez was to receive $20,000 for the marijuana. Ernesto Soto did not have the money but said that he would return shortly to make the payment. At approximately 6:00 p.m., Ernesto Soto returned to the motel parking lot in the Jeep Cherokee. He gave deputy Rodriguez approximately $9,780 and the keys to the white truck to use to deliver the marijuana. Rodriguez agreed to meet Ernesto Soto later that night in a nearby parking lot to make the delivery. Deputy Rodriguez drove the truck back to a Customs warehouse and loaded the marijuana. Customs also installed a "kill-switch" in the truck that would allow the driver to stall the vehicle.

At 7:30 p.m., Customs agents observed the Jeep Cherokee in the designated parking lot. At approximately 7:45 p.m., deputy Rodriguez drove the delivery truck to within one-half block of the parking lot and flipped the kill-switch, stalling the truck near the entrance of the lot. When deputy Rodriguez got out of the truck and lifted the hood, the Jeep drove into the parking lot. Rodriguez saw four people in the Jeep and was able to identify Ernesto Soto in the back seat. As part of the prearranged plan, after Rodriguez gave Ernesto Soto the keys to the delivery truck, a police car pulled up behind the truck. Rodriguez told Ernesto Soto that the deal was off and left the parking lot. Ernesto Soto entered a restaurant next to the parking lot. Customs agents kept

4

him under surveillance.  Ernesto Soto and Israel Soto were arrested at a later date.

On December 5, 1995, Saenz was charged in two counts of a multicount indictment: in count one with conspiracy to possess marijuana with the intent to distribute, and in count three with possession of marijuana with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 846, and 18 U.S.C. § 2. Saenz was arrested in Florida on January 8, 1996.  After a jury trial held on March 7 and 8, 1996, the jury convicted Saenz on both counts.  The court sentenced Saenz to a total of seventy-eight months of imprisonment.  Saenz timely appealed.

## II.  The Evidence as to Baltazar Saenz

The government's case against Saenz on both the conspiracy and possession counts was short on physical evidence. Customs obtained the license plate number of the Jeep Cherokee and later learned that it was registered to Baltazar Saenz.  Saenz's name and telephone number were on a piece of paper found in Israel Soto's wallet.

Neither deputy Rodriguez nor the Customs agents involved in the events of February 14, 1995 in Florida were able to place Saenz inside the Jeep.  Rodriguez testified that he saw four individuals in the Jeep; he identified one of the back seat passengers as Ernesto Soto and described the other back seat passenger as "a short guy with an Afro."  From photographs, Rodriguez later identified the front seat passenger as Joe Saenz, Baltazar Saenz's brother.  Rodriguez could only state that Baltazar

5

Saenz "[t]ends to look like the driver of the vehicle. Of the Cherokee."

The government's case against Saenz was based largely on Israel Soto's testimony. Soto pleaded guilty and as part of his plea agreement agreed to testify against Saenz. Soto's sentencing was delayed until after the trial. At trial, Soto testified that he met Saenz in Florida in 1983, when they both worked for a sod company. Soto testified that he and Saenz "sometimes . . . used to get together, have a few beers." Soto testified that he and Saenz "used to be pretty good friends," and went so far as to say that he "love[s] the guy [Saenz]." Soto testified that he kept in touch with Saenz after Soto moved to Brownsville, Texas in 1989. In approximately 1993, Soto borrowed $1,000 from Saenz and did not repay the loan. Soto testified that he and Saenz agreed that "if we ever get something done, he could have deducted from that." Soto testified that "something" meant "[g]et some marijuana business done"; their agreement was that "[i]f I ever get some marijuana or something, [to] give [Saenz] a call and we work it out together." Soto testified that in December 1994, after he arranged to transport the marijuana to Florida, he called Saenz to ask whether Saenz would receive the shipment and try to sell the marijuana. According to Soto, Saenz agreed.

Soto testified that on February 9, 1995, he made a collect call to Saenz to tell him that "everything was going to be fine" and that the load was "on its way." Soto placed this call from the Cameron County jail. Telephone records confirmed two

6

collect calls, each lasting seven to ten minutes, made from the Cameron County jail to Saenz's Florida residence on February 12 and 13, 1995. The records also showed seventeen telephone calls, each lasting approximately one minute, placed from Soto's residence in Lyford, Texas to Saenz's Florida residence between December 30, 1994 and March 1, 1995. The telephone records also showed several calls from Saenz's residence in Florida to the Brownsville, Texas area during the same period, but none to Soto's Lyford, Texas residence.

Soto testified that on February 15, 1995, after his release from jail, he called Saenz to "find out how things were going [with the load]." According to Soto, Saenz said that "everything went wrong" and that he suspected a set-up because the delivery truck had been in good condition when delivered to deputy Rodriguez. Saenz said that the load had been confiscated and that he had paid $9,780 to Rodriguez. Soto also testified that during the telephone call, Saenz said that he had gone back to pick up Ernesto Soto in the parking lot about an hour after Saenz had left in the Jeep.

Soto denied that he held "anything against Mr. Saenz personally" and explained that he was testifying against Saenz "[b]ecause I realize we made a mistake and I wanted to make it up to me." No other witnesses testified to Saenz's involvement in any aspect of the trafficking operation.

Beatrice Saenz, Saenz's wife, testified for the defense. She testified that she accepted two collect telephone calls from

7

Soto because she thought that the calls were from her cousin, whose first name is also Israel. In each of the two collect calls, the caller asked if Saenz was home; Saenz's wife replied that her husband was at work and hung up. Saenz's wife also testified that she did not take a telephone call from "Israel" on February 15, but that her brothers, who lived at the Saenz residence, may have done so. Saenz's wife also testified that her husband took her out for dinner the night of February 14, 1995.

Saenz testified on his own behalf. His testimony differed from Soto's in numerous respects. Saenz testified that he first met Soto in 1986, not 1983. Saenz denied that he and Soto were "close friends" or "best friends," but described Soto as a "co-worker" that Saenz knew "at work but that was about it." Saenz conceded that he had loaned Soto money, but only $500, not $1,000. Saenz agreed that Soto never paid him back, but denied the existence of any agreement about repaying the loan.

Saenz vigorously denied that he and Soto agreed to sell marijuana. Saenz denied speaking with Soto about a shipment of marijuana; speaking with Soto when he called from the Cameron County jail; and knowing Soto's brother, Ernesto Soto.

## III. The Challenge to the District Court's Questions to the Witnesses

### A. The Applicable Legal Standard

Because Saenz's trial counsel did not object at trial to the district court's questions to the witnesses, this court reviews the district court's actions for plain error. See United States v. Gray, 105 F.3d 956, 964 (5th Cir.), cert. denied, 117 S. Ct. 1856

(1997).  Plain error is "'clear' or 'obvious,' and, '[a]t a minimum,' contemplates an error which was 'clear under current law' at the time of trial."  United States v. Calverley, 37 F.3d 160, 162-63 (5th Cir. 1994) (en banc) (quoting United States v. Olano, 113 S. Ct. 1770, 1777 (1993)).  "[T]o be reviewable under this standard an obvious legal error must affect substantial rights. . . . . [P]lain forfeited errors affecting substantial rights should be corrected on appeal only if they 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'"  Id. at 164 (quoting United States v. Atkinson, 56 S. Ct. 391, 392 (1936)).

"A trial judge has wide discretion over the 'tone and tempo' of a trial and may elicit further information from a witness if he believes it would benefit the jury."  United States v. Rodriquez, 835 F.2d 1090, 1094 (5th Cir. 1988) (quoting United States v. Adkins, 741 F.2d 744, 747 (5th Cir. 1984)).  Federal Rule of Evidence 614(b) permits the trial judge to "interrogate witnesses, whether called by itself or by a party."  FED. R. EVID. 614(b).  In exercising this discretion, the trial court "'may question witnesses and elicit facts not yet adduced or clarify those previously presented.'"  United States v. Williams, 809 F.2d 1072, 1087 (5th Cir. 1987) (quoting Moore v. United States, 598 F.2d 439, 442 (5th Cir. 1979)).  A judge's questions must be for the purpose of aiding the jury in understanding the testimony.  See United States v. Bermea, 30 F.3d 1539, 1570 (5th Cir. 1994) (citing Rodriquez, 835 F.2d at 1094).  However, the trial court's efforts to move the trial along may not come at the cost of "strict

impartiality."  United States v. Davis, 752 F.2d 963, 974 (5th Cir. 1985).

In reviewing a claim that the trial court appeared partial, this court must "'determine whether the judge's behavior was so prejudicial that it denied the [defendant] a fair, as opposed to a perfect, trial.'"  Williams, 809 F.2d at 1086 (quoting United States v. Pisani, 773 F.2d 397, 402 (2d Cir. 1985)).  We recently set out the standard to be applied in making this determination:

> To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor.

Bermea, 30 F.3d at 1569; see also United States v. Mizell, 88 F.3d 288, 296 (5th Cir.), cert. denied, 117 S. Ct. 620 (1996).

Our review of the trial court's actions must be based on the entire trial record.  United States v. Carpenter, 776 F.2d 1291, 1294 (5th Cir. 1985).  "We have consistently held that in determining whether a trial judge overstepped the bounds of acceptable conduct -- that is, violated his duty to conduct the trial impartially -- we must 'view the proceedings as a whole.'" United States v. Lance, 853 F.2d 1177, 1182 (5th Cir. 1988) (quoting Williams, 809 F.2d at 1088-89).  A trial judge's comments or questions are placed in the proper context by viewing the "totality of the circumstances, considering factors such as the context of the remark, the person to whom it is directed, and the presence of curative instructions."  Id.  The totality of the

10

circumstances must show that the trial judge's intervention was "quantitatively and qualitatively substantial." <u>Bermea</u>, 30 F.3d at 1569. The number and nature of the court's questions are important. <u>United States v. Borchardt</u>, 698 F.2d 697, 700 (5th Cir. 1983). The cumulative effect must be "substantial" and must prejudice the defendant's case. <u>Lance</u>, 853 F.2d at 1182; <u>Carpenter</u>, 776 F.2d at 1294.

B.    **The Totality of the Circumstances: An Overview**

Several aspects of this trial are particularly important to this court's assessment of the impact of the trial court's questions of the witnesses. The government's case against Saenz rested largely on the testimony of one witness, Israel Soto. Soto's testimony provided the jury with Saenz's motivation for participating in the marijuana distribution operation. No other witness corroborated Soto's testimony about his relationship with Saenz or the alleged agreement to sell marijuana. No witness corroborated Soto's explanation for the telephone calls made from his residence and from the Cameron County jail to the Saenz residence in Florida. No other witnesses identified Saenz as among the participants in the attempted marijuana delivery in Wesley Chapel, Florida on February 14, 1995.[2] The only physical evidence linking Saenz to the drug operation was that a vehicle registered to Saenz was used to meet undercover officers in the motel parking

---

[2]    Only deputy Rodriguez's testimony that Saenz "[t]ends to look like the driver of the vehicle" corroborated Soto's version of the events. Officer Rodriguez observed the Jeep in the dark and could not swear that Saenz was the driver.

11

lot. In short, Soto's credibility was critical to the government's case.

Saenz's testimony was equally critical. Saenz flatly contradicted Soto on their alleged agreement to traffic marijuana as a way for Soto to repay Saenz, and on Saenz's knowledge of, and participation in, the marijuana delivery. Saenz presented no witnesses to corroborate most of his testimony. His credibility was critical to his defense.

When the jury's evaluation of witnesses' credibility is likely to determine the outcome of a case, questions a judge asks those witnesses implicating their credibility assume heightened importance. See United States v. Cisneros, 491 F.2d 1068, 1074 (5th Cir. 1974); United States v. Filani, 74 F.3d 378, 385-87 (2d Cir. 1996); United States v. Mazzilli, 848 F.2d 384, 388-89 (2d Cir. 1988); cf. United States v. Fischer, 531 F.2d 783, 786, 787 (5th Cir. 1976) (holding that the court's negative comment on the credibility of defense witnesses unduly prejudiced the defendant because the credibility of the witnesses was decisive to the outcome). In Filani, the defendant was stopped at a Customs inspection station in J.F.K. airport. Customs agents searched a briefcase believed to belong to the defendant and found heroin. Filani, 74 F.3d at 380. The initial issue at trial was whether the briefcase belonged to the defendant. The appellate court noted that the outcome of the trial depended on credibility:

> The only witness for the defense was the defendant himself. He testified that he did not own the heroin-filled briefcase and never imported or possessed the contraband. Filani

12

acknowledged having possession of the briefcase, and explained that he had assisted an elderly couple with their bags by carrying their attaché case on his baggage trolley. When he arrived at the customs checkpoint, defendant continued, he left the couple's bag on his trolley. He brought it to [the Customs agent] only because the customs agent specifically directed him to.

Id. at 381. "When the brief trial concluded, the jury had been presented with two divergent accounts of the events at J.F.K. Customs. . . . Thus, the outcome of the trial hinged on credibility." Id. Holding that the trial court's questioning of the witnesses was error, the court stated:

This failure [to maintain an appearance of impartiality] was especially significant where so much hinged on the jury's assessment of the defendant's credibility. We have explained that "a jury's impression that the court disbelieves [defendant's] testimony surely affects its deliberations. The jury cannot be regarded as having freely come to its own conclusions about the defendant's credibility when the court has already indicated, directly or indirectly, that it disbelieves his testimony."

Id. at 386 (quoting Mazzilli, 848 F.2d at 388) (second brackets in original).

In Cisneros, the government's principal witness was a police officer who testified that he bought heroin from Cisneros and an accomplice. Cisneros and the alleged accomplice testified that only the accomplice had sold the heroin to the officer. Cisneros, 491 F.2d at 1070-71. The court noted:

The testimony presented by each side concerning Cisneros' involvement in the heroin sale was in stark, irreconcilable conflict; indeed, the trial judge's comment that "somebody is lying" aptly characterizes the

13

case. Thus the credibility of the witnesses, particularly [the accomplice], was of overriding importance. . . . For Cisneros to prevail, the jury had to believe [the accomplice's] version of the events.

Id. at 1075. The fact that the credibility of the witness was a "central element" in the case was crucial to the court's holding that the trial court had appeared partial to the prosecution. Id. at 1074, 1075-76.

Similarly, in this case, the jury was presented with contradictory accounts of the critical events. The outcome hinged on whether the jury believed the story offered by Soto, a cooperating codefendant, or the defendant himself. The trial court's questions to these witnesses impacting their credibility were likely to be of significance to the jury.

Another aspect of this case critical to this court's review is that the trial was short and the disputed issues were neither confusing nor complex. The trial lasted less than two days. A total of fifteen witnesses testified, many of whom were law enforcement officers presenting cumulative testimony about the events of February 14, 1995. The primary issues before the jury were whether Saenz participated in the conspiracy -- the existence of which was not challenged -- to carry out the marijuana trafficking operation; and whether Saenz was in the Jeep Cherokee.

The need for a trial court to question witnesses to clarify testimony is greatest in a complex or lengthy case with multiple witnesses. See Williams, 809 F.2d at 1087 (noting with respect to a complex, eight-week long RICO trial that "[f]or such

14

a trial to proceed smoothly, it was necessary for the trial judge to exercise tight control over the presentation of the evidence to the jury"); <u>United States v. Manko</u>, 979 F.2d 900, 905 (2d Cir. 1992); <u>United States v. Slone</u>, 833 F.2d 595, 597 (6th Cir. 1987) (citing <u>United States v. Hickman</u>, 592 F.2d 931, 933 (6th Cir. 1979)); <u>United States v. Lueth</u>, 807 F.2d 719, 729 n.5 (8th Cir. 1986). There is a correspondingly reduced need for the court frequently or actively to question witnesses in a short trial with clearly defined and straightforward issues.

This case also lacked another justification for a court's interrogation of witnesses: the need to expedite testimony on certain issues or by certain witnesses. <u>See</u> <u>Adkins</u>, 741 F.2d at 748; <u>Borchardt</u>, 698 F.2d at 700; <u>Slone</u>, 833 F.2d at 597; <u>United States v. Parodi</u>, 703 F.2d 768, 775 (4th Cir. 1983). A review of the record shows that neither Soto's nor Saenz's testimony was repetitive or confusing. There is no indication that counsel were "unprepared or obstreperous" or incompetently trying the case. <u>Slone</u>, 833 F.2d at 597; <u>see also</u> <u>United States v. Bland</u>, 697 F.2d 262, 266 (8th Cir. 1983); <u>United States v. Daniels</u>, 572 F.2d 535, 541 (5th Cir. 1978); <u>United States v. Cassiagnol</u>, 420 F.2d 868, 879 (4th Cir. 1970). The judge did not comment that the lawyers were moving too slowly or wasting time. The judge often allowed the lawyers to return to the topic on which they had been questioning the witness before the judge interrupted to question that witness himself.

15

In relevant aspects, this trial resembled one in which the Sixth Circuit found the trial court's interrogation of witnesses to be excessive:

> This was a one-day trial. The principal issue for the jury was whether it would impute possession of the contraband in the apartment to one or another defendant. Counsel for both sides were able and, at all times, conducted themselves properly. The testimony was relatively clear and any difficulties could easily have been handled by counsel had the judge restrained himself.

Hickman, 592 F.2d at 936.

With these aspects of the trial in mind, we consider the cumulative impact of the specific instances in which the trial court interrogated Soto and Saenz.

C.    **The Court's Questions of Soto**

The district court asked numerous questions during Soto's direct, cross, and redirect examinations.[3]  Saenz argues that the trial court appeared to be partial to the prosecution by eliciting key details from Soto about Saenz's agreement to receive and distribute the marijuana load.

---

[3]    The duration of the court's interruption of the questioning of a witness is a factor in the totality-of-the-circumstances inquiry this court must conduct.  See Williams, 809 F.2d at 1087 ("A statistical count of court interruptions is pertinent to the inquiry.").
    The entire transcript consists of approximately 7,425 lines of witness questions and answers.  Soto's direct examination consists of approximately 725 lines of the trial transcript, including objections made during the testimony.  The court's questioning of Soto, and Soto's answers to those questions, consist of approximately 152 lines of trial transcript, or 21.0 percent of Soto's direct examination.  The court's exchange with Soto during defense counsel's cross-examination consists of approximately 80 out of 600 lines of transcript, or 13.3 percent of the cross-examination.  The court's exchange with Soto during redirect examination consists of approximately 32 out of 135 lines, or 23.7 percent of the redirect examination.  Overall, the court's questions and Soto's answers consist of approximately 264 out of 1460 lines of transcript, or 18.1 percent.

16

During Soto's direct examination, the prosecutor questioned Soto about the beginning of the plan to sell the marijuana load.  When the prosecutor asked Soto if he already had "buyers or people to deliver it to in Florida,"  Soto began to answer that he "called Baltazar."  The court interrupted and led Soto through a series of questions that elicited the details of the agreement between Soto and Saenz:

THE COURT:      You called who?

THE WITNESS:    Baltazar.

THE COURT:      Which Baltazar?

THE WITNESS:    Excuse me?

THE COURT:      What Baltazar did you call?

THE WITNESS:    Baltazar Saenz.

THE COURT:      This defendant?

THE WITNESS:    Yes, sir.

THE COURT:      What did you call him for?

THE WITNESS:    I called him to tell him I -- it was a load of marijuana going to Florida.  To be -- to sell it.

THE COURT:      To find buyers?

THE WITNESS:    Yeah.  Yes.

THE COURT:      He was going to sell it?

THE WITNESS:    Yes, sir.

THE COURT:      Okay.  Where did you call him from?

THE WITNESS:    I called him from -- I was -- I got arrested at that time and I called him from jail.

THE COURT:      You called him from jail?

THE WITNESS:    From the detention center.

THE COURT:      You had been arrested?

THE WITNESS:    Yes, sir.

THE COURT:      Okay.  So you called him from jail?

THE WITNESS:    Yes, sir.

THE COURT:      To Florida?

THE WITNESS:    Yes, sir, to his house.

THE COURT:      What did you tell him?

THE WITNESS:    Well, before that we had an agreement, if
                something come up, just to give him a call and
                we would get things squared up.  And send it
                to him.

THE COURT:      You and he had talked about it before, or
                what?

THE WITNESS:    Yes, sir.

THE COURT:      About marijuana?

THE WITNESS:    Yes, sir.

THE COURT:      So in connection with that agreement you made
                this telephone call?

THE WITNESS:    That is correct.

THE COURT:      And you were expecting him to do what?  To
                receive it?

THE WITNESS:    Yes, to receive it and to sell it.

THE COURT:      And to sell it?

THE WITNESS:    Yes.

THE COURT:      That was what he was going to do?

THE WITNESS:    That is correct.

     The court's questions had the effect of emphasizing for
the jury that Saenz agreed to sell the marijuana and that Saenz and

18

Soto had previously agreed to sell marijuana.  The government had not yet questioned Soto on this topic.

The prosecution then questioned Soto about his first telephone conversation with Saenz about the marijuana.  The questions began as follows:

MR. LARA [prosecutor]:  As to this specific 1100-pound load that was seized, when was it that you first made contact with [Saenz]?  Do you remember?

THE WITNESS:  Well, it was before -- it was before I got in jail.  I think I gave him a call.

The court then interrupted and questioned Soto about where he made the first call to Saenz:

THE COURT:  Where did you call him from on that occasion?

THE WITNESS:  My house.

THE COURT:  Your house where?

THE WITNESS:  In Lyford.

THE COURT:  In Lyford.

THE WITNESS:  Yes, sir.

THE COURT:  To Florida?

THE WITNESS:  To Florida.

THE COURT:  Before you were arrested?

THE WITNESS:  Yes, sir.

THE COURT:  What were you arrested for?

THE WITNESS:  Well, I was --

THE COURT:  Was it this case or something else?

THE WITNESS:  No, it was something else.  They were charging me with possession of weapon.

THE COURT:  But it was something else?

19

```
THE WITNESS:        Yes, sir.

THE COURT:          That's why you were in jail?

THE WITNESS:        Correct.
```

The prosecution then resumed questioning Soto about his arrest for weapons possession. The court again intervened:

```
MR. LARA:           What happened with the deal with the weapon?
                    What were you -- what happened?

THE WITNESS:        I asked a friend of mine to give me a ride and
                    he happened -- he had a gun under his seat.
                    He was drunk.   He didn't have a driver's
                    license.   He didn't have insurance.   So the
                    officer that arrested us, put charge -- DWI
                    charge on him and they tried to put the weapon
                    charge on me.   But I never -- I didn't know
                    the gun was there.   So I started going to
                    court and they --

THE COURT:          Did they find you guilty for it?

THE WITNESS:        No, sir.  They dismissed.

THE COURT:          So you were acquitted?

THE WITNESS:        Yes, sir.

THE COURT:          That's why you were in jail?

THE WITNESS:        That is the reason I was in jail.
```

Before Saenz's counsel had had an opportunity to question Soto on this potential ground of impeachment, the court elicited both that Soto had been acquitted of the charge and his explanation for being incarcerated. The court continued, asking Soto additional questions about his conversations with Saenz:

```
THE COURT:          How long before you went to jail do you
                    remember you talked to him about this?

THE WITNESS:        Okay.  Okay.

THE COURT:          As best you remember.
```

20

THE WITNESS:    I think it was December something.

THE COURT:      December?

THE WITNESS:    Yes, sir.

THE COURT:      '94?

THE WITNESS:    Yes, sir.

THE COURT:      December, '94.  And what is it that you told him then?

THE WITNESS:    I told him that I probably will get a load of marijuana.

THE COURT:      What did he tell you?

THE WITNESS:    That it was all right.  Excuse me.  I told him it was right to work it out.  He said, "Yes".  And then I said, "Well, as soon as I get it, and get everything straight up, I will send it there and you will be in charge".

THE COURT:      Did you tell him what you wanted him to do with it?

THE WITNESS:    Yes, to sell it.

THE COURT:      You told him that?

THE WITNESS:    Yes.

THE COURT:      When you were out of jail?

THE WITNESS:    Yes.

THE COURT:      Did he agree?

THE WITNESS:    Yes, sir.  I even asked him the price.  What the price was around there.

THE COURT:      What was the price?

THE WITNESS:    He told me it was between 750 and 800. Between 500 and 800.

THE COURT:      Between 500 and $800?

THE WITNESS:    750 and 800.  That's what he told me.

THE COURT:      That he would sell it for?

21

THE WITNESS:    Yes, sir.

These questions, eliciting details of Soto's and Saenz's alleged agreement, began only ten transcript pages into Soto's direct examination.  The court's string of short, direct, and sometimes leading questions created an appearance that the court was assisting the government in proving its case.  See Cisneros, 491 F.2d at 1074.  The court's questioning was similar to that found to be improper in Bland, 697 F.2d at 263-64, in which the court's interrogation of a government witness effectively established an element of the offense charged against the defendant.  Contrary to the government's assertion, the court cannot fairly be said to have been "clarifying" Soto's testimony; the prosecution had not yet asked a single question about Saenz's involvement in the marijuana trafficking operation.

The court's questions did not elicit information that the prosecution was likely to have missed.  The mere fact that the trial court itself, not the prosecution, elicited such damaging information contributed to the perception that the court was helping the government.  See United States v. Orr, 68 F.3d 1247, 1250 (10th Cir. 1995) ("Interrogation of witnesses by a judge in a criminal case creates a unique risk that the judge will be perceived as an advocate."), cert. denied, 116 S. Ct. 747 (1996).  The court's questions contributed to the appearance that the court was taking over the responsibility of proving part of the government's case.                   Saenz also argues that several of the court's exchanges with Soto had the effect of bolstering Soto's

22

credibility. The first such exchange occurred shortly after defense counsel began cross-examining Soto. Attempting to impeach Soto's credibility through questions about Soto's prior arrests and convictions, Saenz's counsel asked Soto whether he had been arrested after 1990:

MR. WEISFELD: Okay. And the next time you were arrested after 1990?

THE WITNESS: I got a couple of times arrested for PI.

MR. WEISFELD: Where was that?

THE WITNESS: Here in Brownsville.

THE COURT: PI is public intoxication?

THE WITNESS: That is correct.

MR. WEISFELD: When was that? Do you remember?

THE WITNESS: Well, I believe it was in 1993.

MR. WEISFELD: And from 1993 till 1995, 1996, were you arrested in the interim? Were you arrested again?

THE WITNESS: No, sir.

The court then interrupted defense counsel's cross-examination to question Soto about the details of the alleged agreement with Saenz to receive and sell the marijuana load in this case, a topic defense counsel had not yet covered in cross-examination.

THE COURT: Listen to this question. We are about to take our afternoon recess. You said that you called Mr. Saenz in December of '94.

THE WITNESS: Yes, sir.

THE COURT: And asked him if he was interested -- and you told us the nature of the conversation.

23

Before that time you had been living here in Brownsville?

THE WITNESS:     Yes, sir.

THE COURT:       When was the last time you had talked to him? How much time lapsed or, as we say, passed from the last time you had talked to him?

THE WITNESS:     Okay.    We talked a few times in-between. Because I went -- I went to Florida to work for a little while and then I came back.

THE COURT:       So you would talk to him is what I am asking?

THE WITNESS:     That is correct.

One court has warned that there is a "danger that undue interference with cross-examination rights will result if a judge takes over examination by defense counsel."  Hickman, 592 F.2d at 934.  In this case, defense counsel had no opportunity to resume questioning Soto before the court took an afternoon recess.  This stopped counsel's efforts to cast doubt on Soto's credibility until after the court's questions allowed Soto to reaffirm a part of his earlier testimony crucial to the government's case.

After this exchange, and before the afternoon break, the court continued questioning Soto on a subject covered during Soto's direct examination: Soto's motivation for testifying against Saenz. The following exchange occurred:

THE COURT:       By the way, what did the Government do for you for testifying in this case?

THE WITNESS:     What did they do for me?

THE COURT:       Yes.    Did they offer you something for testifying today?

THE WITNESS:     Nothing.  Well, they just told me if I tell the truth, I might, I might get maybe little low sentence.

24

THE COURT:          Oh, you haven't been sentenced?

THE WITNESS:        No, sir.

THE COURT:          You have not?

THE WITNESS:        I have not.

THE COURT:          So your case hasn't been disposed of yet?

THE WITNESS:        That is correct.

THE COURT:          It is still pending?

THE WITNESS:        Yes, sir.

THE COURT:          When did you plead guilty?

THE WITNESS:        When?

THE COURT:          Yes, sir.

THE WITNESS:        About a month ago.

The government characterizes this exchange as the court's attempt to clarify Soto's testimony for the jury. A trial court may ask questions to clarify witnesses' testimony, even if the questions elicit facts harmful to the defendant. See, e.g., Bermea, 30 F.3d at 1570-71. The court's question about Soto's guilty plea followed earlier questions by both the government and the court about the plea agreement.[4] The fact that Soto had not

---

[4] During Soto's direct examination, the government had already established that Soto was testifying pursuant to a plea agreement:

MR. LARA:           Okay. You were arrested, you were indicted, for participating in a conspiracy with possession with intent to distribute over a hundred kilograms of marijuana, is that correct?

THE WITNESS:        Yes, sir.

MR. LARA:           And you have pled guilty to that offense, is that correct?

THE WITNESS:        Yes, sir.

25

been sentenced, however, had not been brought out by either the government or Saenz's counsel.[5]  The court's last questions before the afternoon recess emphasized this fact:

> THE COURT:  So you are still pending sentencing?
>
> THE WITNESS:  Yes, sir, I came in front of you.
>
> THE COURT:  Before me?
>
> THE WITNESS:  Yes, sir, to plead guilty.
>
> THE COURT:  Who do you understand has the ultimate decision, makes the final decision, as far as what sentence you are going to receive?

> MR. LARA:  As part of your plea agreement with the Government, was it for you to tell us everything you know about this case, is that right?
>
> THE WITNESS:  Yes, sir.
>
> . . . .
>
> MR. LARA:  Okay.  So besides telling us what you knew about everything, the other part of the agreement with the Government was that you would make yourself available to testify, is that correct?
>
> THE WITNESS:  Correct.
>
> MR. LARA:  Okay.  And we have asked you to come and testify today, is that right?
>
> THE WITNESS:  Yes, sir.

The court then interrupted to ask the following questions:

> THE COURT:  The 1100 pound case that you are talking about is this case, the one in which you are listed as a defendant?
>
> THE WITNESS:  That is correct.
>
> THE COURT:  Is that the one you pled guilty to that he is talking about?  Is that the one he is talking about?
>
> THE WITNESS:  It is.

---

[5]  The court's questions to Soto about his pending sentence during questioning unrelated to his sentencing distinguishes this case from those in which the trial court waited until the lawyers' examinations were completed before attempting to clarify issues.  <u>See, e.g.</u>, <u>United States v. Evans</u>, 994 F.2d 317, 323 (7th Cir. 1993); <u>Slone</u>, 833 F.2d at 600.

26

THE WITNESS:    As far as I know, you are, sir.

The court then broke for the afternoon recess.

In its questions of Soto just before the recess, the court elicited the following facts about Soto's plea agreement: (1) Soto had not yet been sentenced; (2) he had been told that he might receive a lesser sentence for testifying truthfully; and (3) the court itself would impose his sentence.  The court's questions may have been perceived as rehabilitating Soto in the middle of defense counsel's cross-examination, on a subject that defense counsel had not yet addressed and could not immediately address because of the recess.  In <u>United States v. Filani</u>, the Second Circuit held a similar set of questions to have conveyed an appearance of partiality: "Questions to [an important prosecution witness], interrupting the defense cross-examination, read almost as a 'redirect' that served to rehabilitate that witness's testimony, and further demonstrate that the district court did not believe defendant's version of the events."  <u>Filani</u>, 74 F.3d at 386; <u>see also</u> <u>Hickman</u>, 592 F.2d at 935.

During Soto's redirect examination, the trial court again returned to Soto's pending sentencing.  The government was questioning Soto about an unrelated topic: his alleged agreement with Saenz to sell marijuana as a way for Soto to repay Saenz.  The court interrupted to ask about Soto's sentencing:

> THE COURT:    Clarify something for me.  And you may have already done it.  I just maybe not have remembered it.  What is it that you are getting in return for your plea of guilty?  Are they dismissing those other cases against you that they may have known about?

27

THE WITNESS: Well, sir, just told me -- if I tell the truth, if I tell all the truth about this -- all these things that happened, they just might recommend to get maybe little low sentence.

THE COURT: Reduction?

THE WITNESS: Reduction.

THE COURT: Reduction of your sentence?

THE WITNESS: That is correct. That's it. They didn't write.

THE COURT: Nobody promised you a thing?

THE WITNESS: Promised me nothing. That's it.

The trial judge prefaced these questions by saying that he could not remember Soto's testimony about the sentencing. However, the judge's questions had the effect of emphasizing for the jury that the court found it important that Soto had not been promised any benefit for testifying. Such emphasis may have created the impression that the court believed that Soto had a particular reason to be truthful. See United States v. Middlebrooks, 618 F.2d 273, 276 (5th Cir.) (noting that it is the jury's likely perception of the judge's purpose in asking a question that is determinative), modified on reh'g on other grounds, 624 F.2d 36 (5th Cir. 1980); Bland, 697 F.2d at 264.

**D.    The Court's Examination of Saenz**

"[T]his Court is particularly sensitive to a trial judge's questioning of the defendant, because '[w]hen a defendant takes the stand in his own behalf, any unnecessary comments by the court are too likely to have a detrimental effect on the jury's ability to decide the case impartially.'" Carpenter, 776 F.2d at

28

1294 (quoting Middlebrooks, 618 F.2d at 277). This is particularly true during a defendant's direct examination, when his credibility is being established. See Mazzilli, 848 F.2d at 388 ("The jury cannot be regarded as having freely come to its own conclusions about the defendant's credibility when the court has already indicated, directly or indirectly, that it disbelieves his testimony."). As the Second Circuit wrote in United States v. Manko:

> A district court must show particular restraint in questioning a criminal defendant during the defendant's direct testimony. At this critical phase of the trial, the court must scrupulously insure that its questions do not indicate that the court doubts that the witness is telling the truth. Impeaching the defendant is the job of the prosecution, not the court.

Manko, 979 F.2d at 906 (citations omitted). The Second Circuit has held that the risks to the defendant posed by the court's interrogation during direct examination are so great that "[i]t is 'clear error for a trial judge to ask questions bearing on the credibility of a defendant-witness prior to the completion of direct examination.'" Filani, 74 F.3d at 387 (quoting United States v. Victoria, 837 F.2d 50, 55 (2d Cir. 1988)). While this circuit has not adopted a per se rule, a careful examination of the likely impact of the court's questions to Saenz during direct examination is required.

The first exchange between the court and Saenz occurred shortly after Saenz's lawyer began direct examination. Defense counsel was questioning Saenz about the loan to Soto that,

29

according to Soto, formed the basis for the subsequent agreement to distribute marijuana. Defense counsel asked Saenz how much he lent Soto and why. Saenz was explaining the amount of and reason for the loan, when the court initiated the following exchange:

THE COURT: When did you loan him the money? In 1993?

THE DEFENDANT: It was one day of 1993. Yes.

THE COURT: Has he ever paid you?

THE DEFENDANT: He never paid me.

THE COURT: Did you ever ask him for it?

THE DEFENDANT: Well, I never talked to him before that. I mean after that.

THE COURT: You loaned him $300 and you never talked to him again?

THE DEFENDANT: No, sir. Because he never came back. Like I say, I was always working, and the only time that I see him is when he came --

THE COURT: Did you know how to get ahold of him?

THE DEFENDANT: No, sir.

THE COURT: You did not?

THE DEFENDANT: No, sir.

. . . .

THE COURT: What kind of relationship did you have with him?

THE DEFENDANT: I knew him from work. Like a co-worker. I would do that to -- I am that kind of person. If somebody comes and asks -- especially I see him coming in his pickup truck with a camper and he had -- he had his children in the back. And his wife was right there, too. When he asked me, that's why I believed him, because he was looking for work.

THE COURT: Then you loaned money to somebody that you didn't -- that you didn't know where he lived.

30

THE DEFENDANT: Yes, sir. Yes, sir. I did.

THE COURT: How did you expect to collect it?

THE DEFENDANT: Well, just hoping that he come back and pay me. I am just that kind of person. I am always getting in trouble with my wife doing that.

THE COURT: Because you loan people [sic] to people?

THE WITNESS: Yes, sir.

The record of this exchange suggests that the trial court expressed disbelief in Saenz's testimony. The court emphasized that Saenz did not seek repayment of the money he loaned to Soto: "You loaned him $300 and you never talked to him again?" Saenz answered that he trusted Soto to pay him back when he could. The court's next question, transcribed by the court reporter as a statement, expresses incredulity: "Then you loaned money to somebody that you didn't -- that you didn't know where he lived."

A judge's expression of disbelief in the defendant's testimony is likely to affect the jury's assessment of the defendant's credibility. See Filani, 74 F.3d at 385-86; Mazzilli, 848 F.2d at 388; Victoria, 837 F.2d at 54-55. When a judge's questions focus on particular portions of a witness's testimony, the jury is likely to attach more weight to the portions on which the judge's questions focus. See Cisneros, 491 F.2d at 1075 ("It strikes us as unlikely that a juror would willingly admit to having missed something the trial judge considered important, and even more unlikely that the jury would decline an invitation to consider something the trial judge clearly believed to be significant."). The court's skeptical questions about Saenz's explanation of the

31

loan was likely to affect the jury's evaluation of Saenz's credibility.

Later in the direct examination, defense counsel asked Saenz if he had participated in this attempted marijuana delivery. Saenz denied any involvement. He denied even knowing Ernesto Soto. The court interrupted to ask Saenz if he was involved in the transaction. The court's questions came just after Saenz's counsel had thoroughly questioned Saenz about his alleged involvement and Saenz had repeatedly denied his involvement:

> THE COURT: Did you have anything to do with the marijuana transaction involved in this case?
>
> THE DEFENDANT: No, sir. I am just a hard working man. I have been working ever since I was out of school. I got out of school because I didn't go -- because I needed to go to work to support my -- help my parents. And I never -- never been in that kind of deal. Never used that kind of drugs. Never been in that.

The court went on:

> THE COURT: Well, do you admit that was your vehicle that was -- that we saw a picture of?
>
> THE DEFENDANT: In the picture, it looks like my vehicle. And if they are saying they got the tag, that's -- that it was my Jeep. It looks like it.
>
> THE COURT: Assuming it was your Jeep, can you explain why it was there when this transaction was going down?
>
> THE DEFENDANT: Why? Well, I didn't have -- I wasn't driving the Jeep that day. To me it looked -- if it was -- that Jeep, it was in the shop a little bit over a week for mechanical problems. Between that period of time that they are saying that they saw the Jeep. It was in that shop where I had my forklift repaired.

THE COURT:      So what is it that you are telling the jury?
                That somebody from the shop used it for these
                purposes?

THE DEFENDANT: All --

THE COURT:      If it was used for those purposes shown or
                indicated?

THE DEFENDANT: Well --

THE COURT:      What is it you are telling the jury?

THE DEFENDANT: I didn't have the Jeep.  I didn't have control
               of that Jeep that week.  That week it was in
               the auto repair shop for mechanical problems.
               But it was still drivable.

. . . .

THE COURT:      So it is your testimony to this jury that it
                was at the shop that you -- that you think
                that that -- that was the place from which
                that Jeep was used, the Cherokee was used?

THE DEFENDANT: That's where the Jeep was supposed to be
               parked, there waiting for parts to get fixed.
               That's where it was in-between that period of
               time.

THE COURT:      But it could still travel?

In _Filani_, the Second Circuit found that similarly phrased questions of a defendant by a trial court, such as: "Is that what you are telling me?"; "All I asked you is, do you support the other children?"; and "No, sir, listen to me," tainted the trial.  See _Filani_, 74 F.3d at 382, 385-86.

The court's repeated question, "so what is it you are telling the jury?" may have conveyed an impression of the court as prosecutorial, rather than impartial.[6]  While courts have been

_____

[6]    The court twice cut off Saenz's attempt to answer the court's question:

willing to overlook similarly phrased questions that concerned collateral or unimportant details, see, e.g., Manko, 979 F.2d at 907, the questions asked here, as in Filani, went to the heart of the defense.

The court's questions also forced Saenz to take a position on whether he believed that someone else may have taken his Jeep from the repair shop and driven it to the parking lots. The court renewed its questions about whether anyone else may have had access to Saenz's Jeep:

    THE COURT:      Now, do you know whether any of your brothers
                    drove that Jeep to the event in question?

    THE DEFENDANT:  I don't know, sir.

    THE COURT:      Beg your pardon?

    THE DEFENDANT:  I don't know.  I didn't know --

    THE COURT:      Did any of your brothers ask you for
                    permission to use that Cherokee?

    THE DEFENDANT:  No, sir.

    THE COURT:      Would they have asked you for your permission
                    to use it?

    THE DEFENDANT:  No, sir.

    THE COURT:      They would use it without asking you?

---

    THE COURT:      So what is it that you are telling the jury?
                    That somebody from the shop used it for these
                    purposes?

    THE DEFENDANT:  All --

    THE COURT:      If it was used for purposes shown or indicated?

    THE DEFENDANT:  Well --

    THE COURT:      What is it you are telling the jury?

34

THE DEFENDANT: Well, couple of my brothers work for me. And they have -- they use my Jeep. You know, like if we are doing a job, if they needed to go to store or something, they just go and get it.

THE COURT: Without asking you?

THE DEFENDANT: Same way with my other employees.

THE COURT: Wasn't that Cherokee used for your family?

THE DEFENDANT: No, sir.

THE COURT: It was not?

THE DEFENDANT: No, sir.

THE COURT: What would your family use?

THE DEFENDANT: Jeep.

THE COURT: Another one?

THE DEFENDANT: Yes. That's my -- that was one of my work vehicles. Remember I had more than one work vehicle. Also had another Jeep that my wife -- the one that my wife drives back and forth to do the bills and collect money and to do other things.

THE COURT: But your brothers had access to the Cherokee?

THE DEFENDANT: Yes, sir.

THE COURT: And you are telling this jury that you are sure or you are not sure they were the ones driving the Cherokee on the day in question?

THE DEFENDANT: If I would say I was sure -- no, I am not sure. I am going to be lying if I say they were the ones. I am not sure.

The effect of repeatedly questioning Saenz as to whether his brothers would use the Jeep without his permission was to convey skepticism as to Saenz's explanation that someone else may have driven the Jeep to the parking lot. The effect was more pronounced because it was the court's questions, not counsel's,

that made Saenz commit to the explanation that the court then challenged.[7]

## IV. The Cumulative Effect of the Court's Questions

Soto provided the only testimony of an agreement between Soto and Saenz to distribute marijuana. Saenz flatly denied the agreement and the conversations Soto described. The only physical evidence linking Saenz to the February 14 meetings was that the Jeep was registered in Saenz's name and that Saenz's name and telephone number were in Soto's wallet. However, it was Saenz's brother, not Saenz, who was identified as present in the Jeep. Saenz testified that his brothers had access to the Jeep, even when it was in the repair shop. The telephone calls from Soto to the Saenz residence on February 12, 13, and 15, 1995 were evidence supporting the government's case. Saenz testified, however, that he did not take these calls. Saenz's wife testified about other persons who might have taken the calls. The jury could reasonably have believed Saenz's testimony over Soto's.

This trial was not complex or lengthy. It did not involve repetitive or convoluted testimony. The court's questions on occasion repeated points already made by the parties. The lawyers did not appear to be lagging or confusing the jury. See, e.g., Orr, 68 F.3d at 1251-52 ("In the context of this somewhat complicated trial, the court's brief questioning of three witnesses

---

[7] The court's questioning of Saenz during direct examination, and Saenz's answers to those questions, consist of approximately 253 lines out of a total of 1075 lines of transcript, or 23.5 percent of the direct examination. The court did not significantly interrupt Saenz's cross or redirect examinations.

36

did not create an appearance of partiality toward the government."); Lueth, 807 F.2d at 727 ("We have always been reluctant to disturb a judgment of conviction 'by reason of a few isolated, allegedly prejudicial comments of a trial judge,' particularly in a long trial." (quoting Bland, 697 F.2d at 265)); Lance, 853 F.2d at 1183; Williams, 809 F.2d at 1090; Adkins, 741 F.2d at 748. The court's questions did not address collateral matters and were not asked of insignificant witnesses. Rather, the court extensively questioned the two key witnesses, one of whom was the defendant, on matters at the heart of the case. The factors recognized as justifying extensive court involvement in the interrogation of witnesses were not present.

The relatively scant evidence against Saenz is another factor that distinguishes this case from cases in which overinvolvement was not found to be prejudicial. See, e.g., Carpenter, 776 F.2d at 1295 (declining to find prejudice resulting from improper comments by the trial court in part because the government had presented "substantial" and "abundant" evidence in support of the defendant's guilt); Middlebrooks, 618 F.2d at 277 (noting that the trial court's prejudicial comments were "isolated incidents in a four-day trial in which there was ample evidence upon which to convict the defendant").

The district court twice instructed the jury that the court had no opinion about the case and that they were to disregard

questions or comments that may reveal an opinion.[8]  Courts have often recognized that curative instructions may render nonprejudicial the court's partial comments or questions.  <u>See, e.g.</u>, <u>Bermea</u>, 30 F.3d at 1571-72; <u>Williams</u>, 809 F.2d at 1088. "Some comments, however, may be so prejudicial that even good instructions will not cure the error."  <u>Id.</u> at 1088; <u>see also</u> <u>Carpenter</u>, 776 F.2d at 1295-96.  Several courts have explicitly found judicial overinvolvement despite curative instructions.  <u>See, e.g.</u>, <u>Filani</u>, 74 F.3d at 386; <u>Hickman</u>, 592 F.2d at 936; <u>Cisneros</u>, 491 F.2d at 1075-76; <u>United States v. Hoker</u>, 483 F.2d 359, 368 (5th Cir. 1973); <u>Bursten v. United States</u>, 395 F.2d 976, 984 (5th Cir. 1968).

The cumulative effect of the questioning by the district court, in a trial lasting only two days, in which the outcome hinged on the jury's evaluation of the credibility of two witnesses, mandates the conclusion that in this case, the court's

---

[8]    Before opening statements the court told the jury:

Federal judges can express their opinion about things, I guess.  And Federal judges can and will ask questions. But as we begin our case, I will tell you that I do not have an opinion about this case.  And if I do anything during the course of the trial to lead you to believe that I have an opinion about the case, please disregard it.  That's your thing.  I don't want to invade it.  I will remember to -- if I remember, I will tell you the same thing at the conclusion of the case.  If I ask a question, do not give it any more or less weight than if anybody else asked it.  I don't have an opinion about the case.

At the close of evidence, the court stated:

As we begin our trial, I told you that I did not have an opinion about the case.  I still don't.  So if I did anything during the course of the trial that lead you to believe that I have an opinion about the case, please disregard it.  It was not my intention to do so.

38

instructions were insufficient to overcome the prejudicial impact of the court's questions and comments. The problem this record presents is similar to that described in <u>United States v. Cisneros</u>, in which this court stated:

> [W]e believe that the comments here challenged were simply too harmful to be cured by the other instructions given to the jury. The credibility issues before the jury were close, difficult, and extremely important. In such a case commenting on the evidence is a perilous endeavor, to be undertaken with caution lest the slightest suggestion of favor for one side or the other from the supposedly impartial moderator tip the balance and impel a decision. Here the trial judge, in the guise of fair comment, overreached, and by adding evidence on the credibility of a key witness seriously impaired appellant's right to a fair and impartial trial.

<u>Cisneros</u>, 491 F.2d at 1075-76.

We do not suggest that the district court intended to skew the jury's view of the evidence or to convey a bias in favor of the prosecution. The court's instructions make this clear. However, our review focuses on the cumulative effect of the judge's questions upon the jury, in the unusual circumstances presented by this short trial in which the outcome depended largely on the credibility of two witnesses. <u>See</u> <u>Middlebrooks</u>, 618 F.2d at 276; <u>see also</u> <u>Lueth</u>, 807 F.2d at 727 ("Our cases addressing the impartiality of trial judge conduct stress the importance of the <u>jury's</u> perception that the judge is favoring the prosecution or believes the defendant to be guilty." (emphasis in original)). The totality of the circumstances in this case lead us to conclude that the court's questioning "could have led the jury to a

39

predisposition of guilt by improperly confusing the functions of judge and prosecutor." <u>Bermea</u>, 30 F.3d at 1569.  The court's overinvolvement was plain error.

We do not reach Saenz's three remaining points of error. We reverse Saenz's conviction and remand the case for a new trial.