IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 02-10180

———————————————

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                        versus

MARISELA BEJAR SANCHEZ,

                                        Defendant-Appellant.


———————————————

Appeal from the United States District Court
For the Northern District of Texas

———————————————

March 21, 2003


Before JOLLY, HIGGINBOTHAM, and MAGILL,[*] Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

    A jury found Marisela Bejar Sanchez guilty of one count of
conspiracy to commit offenses against the United States in
violation of 18 U.S.C. § 371 and five counts of making and using
false statements and documents in a matter within the jurisdiction
of the Small Business Administration, and aiding and abetting, in
violation of 18 U.S.C. §§ 1001-02.  Sanchez urges here that the
district court deprived her of a fair trial by making comments and

———————————————

        [*]Circuit Judge of the Eighth Circuit, sitting by designation.

questioning witnesses in a manner partial to the prosecution and that the questions and comments had the cumulative effect of prejudicing the jury against her. We cannot agree, and affirm her conviction.

## I.

Sanchez, her husband, Willie Sanchez, and her father, Luis Bejar, were partners in an auto repair business, known originally as "Slick Rick's Automotive Repair" and later as "R.A.C.E.," Rick's Automotive Car Experts. Rita Barton was an accountant hired by the partners to provide bookkeeping services for the business and prepare individual and partnership income tax returns for the partners.

When, in June 1994, the partners' automotive repair business fell into financial distress, Barton suggested to Sanchez that the partners could apply for a federally guaranteed small business loan to expand to include vehicle emissions inspections. Barton advised Sanchez that the partnership would not qualify for the small business loan if Sanchez and her husband were listed on the loan application because Sanchez and her husband both had bad credit histories; however, because Bejar had a good credit history, he could qualify for the small business loan if he was listed as the sole proprietor of the automotive repair business.

Sanchez allegedly spoke to Bejar about Barton's suggestion, and Bejar agreed to apply for a small business loan as the sole

2

proprietor of the family's automotive repair business. On June 4, 1994, Sanchez caused an assumed name certificate to be filed in Dallas County, Texas, showing Bejar as the sole owner of an automotive repair business named "R.A.C.E." On December 30, 1994, Bejar applied to the Money Store, a preferred lender for the Small Business Administration, for a federally guaranteed small business loan in the amount of $156,000. According to the application, the loan was supposed to be used for the acquisition or repair of machinery, or both, and other business expenses related to the operation of the automotive repair business. The application indicated that Bejar was the sole owner of the business.

Bejar had good credit, but apparently Bejar did not have an adequate income history to qualify for the small business loan. To overcome this problem, in late 1994 Barton created false income tax returns for Bejar that exaggerated Bejar's income for 1991, 1992, and 1993. Bejar signed these false returns, and Barton obtained false IRS verifications for these returns from an IRS employee whom Barton bribed.

While Barton was preparing Bejar's small business loan application, Sanchez approached Robert Roy Cook, a salesman for Technical Service and Equipment, Inc., an automotive service equipment company. Sanchez told Cook that she was interested in expanding R.A.C.E. and buying automotive service equipment. Cook testified that Sanchez initially indicated that R.A.C.E. would use

3

the proceeds of its small business loan to buy about $100,000 of equipment; however, Cook testified that Sanchez later told him that R.A.C.E. would not buy that much equipment because she wanted cash back from the loan. The loan required the borrower to provide a cash infusion in the amount of 25% of the face value of the loan and could only be used to purchase automotive services equipment and pay off other legitimate business expenses. Therefore, Cook prepared false business letters, sales invoices and other documents showing payments of approximately $39,000 from R.A.C.E. to Technical Service for various pieces of automotive services equipment. At some point during this same time period, Sanchez began working for Barton, assisting her accounting business.

The Money Store disbursed the $156,000 loan on March 15, 1995, through three escrow checks: (1) a check in the amount of $151,500 payable to Technical Service; (2) a check in the amount of $2,184 payable to the SBA to cover the SBA's fees; and (3) a check in the amount of $2,316 payable to Bejar to cover miscellaneous closing expenses. Cook deposited the $151,500 check in Technical Service's bank account but promptly wrote Sanchez two checks from that account that covered most of the proceeds of the small business loan: one check in the amount of $40,000 was payable to "Race", and another check in the amount of $76,500 was payable to Sanchez, personally. Sanchez subsequently deposited the $40,000 "Race" check in R.A.C.E.'s bank account at Compass Bank on March 20, 1995.

4

Sanchez cashed the second check for $76,500 and used it to purchase two cashier's checks payable to herself in the amount of $45,000 and $30,000. Sanchez ultimately deposited the $45,000 cashier's check in the R.A.C.E. bank account at Compass Bank and endorsed the $30,000 check to Fairfield Investments.

From March 15, 1995, until May 23, 1996, Sanchez made about ten payments on the small business loan. In August 1997, after Sanchez stopped making payments on the small business loan, Bejar was forced to file for bankruptcy, listing the small business loan and several obligations related to R.A.C.E. as his debts. The SBA ultimately covered the outstanding balance of Bejar's debt to The Money Store.

On March 8, 2000, Sanchez, Bejar, and Cook were indicted on one count of conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371 and on eleven counts of making and using false statements and documents in a matter within the jurisdiction of the SBA (and aiding and abetting the same) in violation of 18 U.S.C. §§ 1001-02.[1] Barton, the accountant, was also charged with similar crimes in a separate indictment. She entered into a plea agreement with the government and pled guilty to two counts charging violations of 18 U.S.C. §§ 371 and 1001.

---

[1] The government ultimately dismissed the charges against Bejar after it determined that Bejar had no interest in the loan and no knowledge of the true nature of the fraudulent loan scheme.

5

From July 10 through July 17, 2001, Sanchez was tried before a jury in the United States District Court for the Northern District of Texas. The jury convicted Sanchez on the conspiracy count and on the five substantive counts related to the submission of Bejar's false income tax returns and Technical Service's false invoices. It acquitted Sanchez on six substantive counts based upon the submission of false IRS tax verifications, false business letters from Technical Service, and a false statement from Pain Webber. Sanchez timely appealed.

## II.

Because Sanchez's counsel did not object to the questioning of witnesses by the judge, we review the district court's conduct only for plain error.[2] Plain error is "clear" or "obvious" error that affects "substantial rights" of the defendant and "seriously affects the fairness, integrity, or public reputation of judicial proceedings."[3]

As we explained in *Saenz*, a trial judge has wide discretion over the "tone and tempo" of a trial and may elicit further information from a witness if he believes it would benefit the jury.[4] Federal Rule of Evidence 614(b) permits the trial judge to "interrogate witnesses, whether called by [himself] or by a

---

[2] *United States v. Saenz*, 134 F.3d 697, 701 (5th Cir. 1998).

[3] *Id.* (internal quotations and citations omitted).

[4] *Id.*

6

party."[5]  In exercising this discretion, the trial court may question witnesses and elicit facts not yet adduced or clarify those previously presented.[6]  However, a judge's questions must be for the purpose of aiding the jury in understanding the testimony.[7] Furthermore, the trial court's efforts to move the trial along may not come at the cost of "strict impartiality."[8]

In reviewing a claim that the trial court appeared partial, this court must review the entire record and the "totality of the circumstances" surrounding the judge's conduct to "determine whether the judge's behavior was so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial."[9]  To rise to the level of a constitutional error, the district judge's conduct, viewed as a whole, must amount to a "quantitatively and qualitatively" substantial intervention that could have led the jury to "a predisposition of guilt by improperly confusing the functions of judge and prosecutor."[10]

---

[5] Fed. R. Evid. 614(b).

[6] *Saenz*, 134 F.3d at 701.

[7] *Id.* at 702.

[8] *Id.*

[9] *Id.* (internal quotations and citations omitted).

[10] *Id.* (internal quotations and citations omitted).

III.

Sanchez argues that, as in *Saenz*, the outcome of the trial hinged on the jury's evaluation of the credibility of the government's key witnesses and that the court committed plain error by making comments and asking questions that were partial to the prosecution and prejudiced the jury against Sanchez.

A.

The first alleged error occurred during the testimony of Rita Barton, the accountant who helped create and package the fraudulent loan materials for submission to the lender. The argument is that the district court improperly rehabilitated Barton by its actions on four occasions during Barton's testimony. The first incident occurred when the district court questioned the fairness of impeaching Barton with a statement taken from investigative notes. The second incident occurred when the district court interrupted the defense's cross-examination to clarify that Barton had pled guilty to charges related to one of the fraudulent loans and "accepted responsibility" for her actions. The third incident involved the district court cutting short defense counsel's questioning about the number of false statements Barton had made for which she had not been charged. The district court informed the jury that Barton was a "serial fraud liar," that she had "plenty of motive to want to please the government," and that "her testimony should be weighed by you with great caution and great

8

care."  The final incident concerned defense counsel's attempt to impeach Barton by noting that although she agreed to take a polygraph as part of her plea agreement, the government never asked her to take one.  The district court gave the jury an extensive instruction that the results of polygraphs are inadmissible and "would be a big fat goose egg and wouldn't have anything to do with anything going on in these four walls."

While some of the district court's interventions during the cross-examination of Barton may have been inadvisable, they do not rise to the level of plain error.  The district court was exercising its proper role of making evidentiary rulings and using its discretion to prevent repetitive and cumulative evidence.[11] Viewed in context, these questions and comments do not demonstrate partiality on the part of the district court.  In fact, the court made several comments damaging to Barton's credibility, including calling her a "lying, thieving, prevaricating, false-statement-giving thief and con person" who "obviously has plenty of motive to lie to get the government to maybe give ... her the benefit of a lesser sentence."  The court did not substantially interfere with the defense's impeachment of Barton.

B.

---

[11] *See Morre v. United States*, 598 F.2d 439, 442 (5th Cir. 1979).

9

Next, Sanchez alleges that the district court interfered with the cross-examination of Robert Cook, the employee of Technical Service who produced false invoices and letters that were used in the loan application. Sanchez alleges that the district court improperly rehabilitated Cook following the defense attorney's impeachment of Cook with inconsistent statements.

She objects to the district court's statement that "best I can tell, no one can lay a glove on you, you're in the clear, it's over for you." In context, the court was trying to calm both the witness and the lawyers, nothing more.[12]

As to the lecturing of defense counsel about proper impeachment techniques, the court was not plainly in error. The trial judge instructed defense counsel not to impeach the witness with statements that were not his, but were instead statements from the investigator's interview notes. Even assuming the district court misstated the rules of evidence, which is by no means clear, making evidentiary rulings is entirely appropriate and the instructions were invited by the defense counsel's question to the

---

[12] The comment by the court followed a heated exchange between defense and prosecution counsel and reads:

> What did everyone have for lunch? First of all, just – chill out. And – and your [the witness's] overall demeanor, best I an tell, no one can lay a glove on you, you're in the clear, it's over for you. So everybody needs to relax, listen to the question and answer the question.

court on how he was to proceed. The district court did not stray from neutrality or act improperly.[13]

## C.

Sanchez's third complaint is that the district court improperly interfered with the impeachment of investigating agent Jones. Defense counsel was impeaching the witness by referencing the witness's testimony before the grand jury. Throughout the trial, defense counsel and the district court had numerous discussions on the proper technique for impeaching a witness with a prior inconsistent statement. In questioning agent Jones, defense counsel apparently attempted to impeach her by attacking her character pursuant to Rule 608(b) by pointing out that she had misled the grand jury. The district court interrupted, assuming that defense counsel was again using the grand jury testimony as an inconsistent statement, and instructed defense counsel that agent Jones had not yet made a statement that was inconsistent with her grand jury testimony. Defense counsel noted his objection for the record, and the district court overruled the objection stating that it was "improper impeachment." Sanchez argues this exchange created an appearance of bias.

While the district court's ruling of "improper impeachment" was erroneous, it was based on defense counsel's previous conduct and failure to object properly. The district court thought this

---

[13] *Id.*

11

another attempt to impeach with an inconsistent statement, and defense counsel did not correct the court's error. Instead, defense counsel invoked the rote, "goes to credibility," rather than urging that the effort was to show by specific acts that agent Jones was untruthful. Given the context and the previous discussions of impeachment with inconsistent statements, the district court did not act improperly.

D.

The final complaint is that on several occasions the district court questioned witnesses and elicited responses that were harmful to the defendant. We noted in *Saenz* that "[t]he mere fact that the trial court itself, not the prosecution, elicited ... damaging information contributed to the perception that the court was helping the government."[14] Aware of this reality, these allegations must be examined closely.

The first incident occurred during the defense's cross-examination of Barton. The witness asked to clarify an answer, and when defense counsel instructed her that the court would probably prefer that they move on, the court interrupted and allowed the witness to clarify her answer. The clarification implicated the defendant when the witness testified that Sanchez knew that Barton had to "take care of business" at the IRS, although Sanchez did not know any details. The court then asked if this occurred while

---

[14] *United States v. Saenz*, 134 F.3d 697, 707 (5th Cir. 1998).

12

Sanchez was working for Barton, and if Barton was "seeing [Sanchez] on a daily basis," to which Barton answered yes. This testimony made it more likely that Sanchez knew that Barton was falsifying documents.

Defense counsel later tried to clarify that Sanchez was not working for Barton at the time. In response to an extended series of questions on this point, the district court stated, "All this is because I asked her if she was - if Marisela was working for her at the time the documents were sent in and she said yes?" The argument is that this comment suggested to the jury that defense counsel's questions were not important, minimizing the impact of his attempt to clarify when Sanchez was working for Barton.

The next incident occurred during the cross-examination of agent Jones. Defense counsel asked agent Jones a series of questions to determine who approached Cook about creating the false invoices. The court interrupted and stated:

> Look, look, life's too short for this. And I hesitate to get involved here, but we've taken about eight questions to get to the very first question you asked that she didn't understand, that she didn't answer. He asked you who dummied up – your understanding, your belief from six years of living with this, who dummied up the invoices. That's what he asked you eight questions ago. And now we're going through all this.

In response to this statement the witness responded, "Bob Cook dummied them up at the direction of Marisela Sanchez."

In fact, the question defense counsel had asked agent Jones was who had approached Cook, not who dummied up the invoices.

13

While the district court slightly misstated the question, the answer was responsive to defense counsel's initial question. When defense counsel continued his questioning about who approached Cook, the witness repeated that Sanchez had asked Cook for the false invoices and Barton had asked for false letters in support of the invoices. Defense counsel then attempted to impeach Jones by pointing out that she had initially told prosecutors that Bejar, Sanchez, and Barton had asked Cook for false documents, rather than just Barton and Sanchez.

The final incident occurred near the end of trial, during the cross-examination of agent Jones, and was potentially the most damaging to the defense. Defense counsel was trying to establish that Jones had testified to the grand jury that Bejar was involved in the scheme and that was the reason the grand jury had indicted Bejar. The defense was emphasizing that contrary to Jones's grand jury testimony implicating Bejar, Jones and the prosecution did not implicate Bejar at trial. After both sides had finished questioning Jones, the following exchange took place.

> THE COURT: Okay. Let's talk about the grand jury a minute since there has been so much talk about that and what really is going on here.
> Isn't it true that you went to the grand jury before your investigation is complete in this series of cases?
> THE WITNESS: Yes, sir.
> THE COURT: And there's a real good reason for that, isn't there?

14

THE WITNESS:  Yes, sir.

THE COURT:  Did you ever have any talk with the government about the statute of limitations in this case?

THE WITNESS:  Yes, sir.

THE COURT:  From March – the indictment was returned, I guess, on March 8 of 2000.  Right?

THE WITNESS:  Yes.

THE COURT:  And the first funded loan was this one, March 15?

THE WITNESS:  March 15th.

THE COURT:  Of '95?

THE WITNESS:  Yes, sir.

THE COURT:  A week shy of five years.  Correct?

THE WITNESS:  Yes, sir.

THE COURT:  And after – is it true that at the time you went to the grand jury, you did not – *you had not completed your investigation, and as an unfortunate consequence of that, maybe some people got indicted that shouldn't have been*?

THE WITNESS:  Yes, sir.

THE COURT:  *Chief among them being Luis Bejar*?

THE WITNESS:  Yes, sir.

THE COURT:  And the reason for that is you were just going off of documents –

THE WITNESS:  Yes, sir.

THE COURT:   – rather than completing the investigation and actually interviewing the people to figure what was going on.

THE WITNESS:  Yes, sir.  Time was running out.

[Defense Counsel]: Ask a couple follow-up questions to the Court's questions?

15

THE COURT: Well, it's the government's turn. Anything else?

[Prosecutor]: All right. With respect to the statute of limitations – I don't have any other questions to ask.

THE COURT: *When something is true, that's probably the best way to handle it.*

[Prosecutor]: Yeah, thank you.[15]

It is apparent from the court's leading questions that the court believed that Bejar was indicted only as a result of the rush to obtain indictments before the statute of limitations ran out, rather than because he was guilty. The court's final statement, "When something is true, that's probably the best way to handle it," left no doubt that the court believed this is what happened, rather than simply putting it forward as one possible scenario of events.

Sanchez argues that this evidence devastated the defense that the government believed that Bejar was part of the scheme and indicted him, and that Bejar changed his story to implicate Sanchez in order to save himself after he was indicted. Sanchez argues that by providing the jury with an innocent explanation for why Bejar was indicted and the charges later dropped, the judge's leading questioning and comments destroyed the defense theory that Bejar changed his story to avoid punishment.

---

[15] Emphasis added.

The court's questions and comments clearly helped the prosecution. While the court's explanation was apparently true, the fact that the court elicited the information potentially gave the appearance that the court was partial to the prosecution, particularly because of the leading nature of the questions and the court's comment that "[w]hen something is true, that's probably the best way to handle it."

IV.

We must consider the totality of the court's behavior in view of the entire record to determine if there was a constitutional violation.[16] When viewed in totality, the court's questioning of witnesses, comments on the evidence, and evidentiary rulings do not amount to a "quantitatively and qualitatively" substantial intervention that could have led the jury to "a predisposition of guilt by improperly confusing the functions of judge and prosecutor."[17] While Sanchez's contentions have force and rest on what is at best inadvisable interventions by the district court, they are only a part of the court's involvement in the trial. A trial is not a scripted stage performance but rather it is a dynamic and highly charged process which must be judged as a whole and not in chosen segments. The number of times the court was

---

[16] *See United States v. Saenz*, 134 F.3d 697, 702 (5th Cir. 1998).

[17] *Id.* (internal quotations and citations omitted).

17

required to intervene in the trial, each in an entirely appropriate manner, blunts the effect of the complained-of incidents. When viewed as a whole, and the compelling case presented by the prosecution, the district court's conduct does not rise to the level of plain error.

Sanchez argues that this case is indistinguishable from *Saenz*, where we found that the district court's action had deprived the defendant of a fair trial. We do not agree, as the same "unusual combination of circumstances" is not present here.[18]

In *Saenz*, the trial court interrogated both the defendant and the government's only cooperating witness extensively and elicited testimony that damaged the defendant and bolstered the government's witness. We reversed, in part, because the outcome of the case "hinged" on the jury's assessment of the credibility of the *competing* testimony of the defendant and the witness for the prosecution.

In contrast, Sanchez did not testify on her own behalf, as Saenz did, and faced no improper questioning from the judge.[19] It is true that the credibility of Barton, Cook, and Jones was important, but the case did not "hinge" on the jury's assessment of

---

[18] *Id.* at 699.

[19] *Compare United States v. Cantu*, 167 F.3d 198, 203 (5th Cir. 1999), *with Saenz,* 134 F.3d at 709 (noting that the court is particularly sensitive to a trial judge's questioning of a defendant).

18

the credibility of two *competing* witnesses, as it did in *Saenz*. In fact, the government's case against Sanchez featured multiple witnesses, including coconspirators and law enforcement officials, as well as documentary evidence that showed that Sanchez personally participated in the process of obtaining the small business loan and that Sanchez personally received the proceeds of the loan from Cook.[20]

Finally, in this case, the district court's comments and questions were not nearly as extensive or as inherently prejudicial as the trial court's comments and questions in *Saenz*.[21] While the comments concerning the indictment of Bejar brought the judge close to the line, Sanchez overstates the importance of Bejar's indictment to the defendant's case. As the defense noted in its opening statement, "Luis Bejar may or may not have known" that Rita Barton fabricated the loan documents. Sanchez's defense did not hinge on Bejar's knowing involvement in the crime, nor did the testimony elicited from Jones rule out the possibility that Bejar was lying on the stand concerning his daughter's involvement.

V.

Some of the district court's comments were unwise, but after a review of the entire record we cannot say that the incidents

---

[20] *See Cantu*, 167 F.3d at 203 (distinguishing *Saenz* on similar grounds).

[21] *Id.* (distinguishing *Saenz* on similar grounds); *United States v. Lankford*, 196 F.3d 563, 572-73 (5th Cir. 1999) (same).

19

complained of deprived Sanchez of her fundamental right to a fair trial. Specifically, we are not persuaded that they seriously affected the fairness, integrity, or public reputation of the judicial proceeding. Therefore, we AFFIRM.