# United States Court of Appeals
# for the Fifth Circuit

---

No. 24-10644

---

United States Court of Appeals
Fifth Circuit

**FILED**

December 8, 2025

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee*,

*versus*

Christopher Kirchner,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:23-CR-127-1

---

Before Higginson, Willett, and Engelhardt, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

Christopher Kirchner, a startup founder and CEO, diverted millions in investor funds to bankroll a lavish personal lifestyle instead of building his company. When the money ran dry, he doubled down—launching new funding rounds and luring investors with fabricated documents and other material misrepresentations. A jury saw through it, convicting him on four counts of wire fraud and seven counts of money laundering. The district court sentenced him to 240 months in prison. Kirchner now appeals both his conviction and his sentence, but finding no plain error, we AFFIRM them in full.

No. 24-10644

I

A

Kirchner was the cofounder and CEO of Slync, a logistics software startup based in Dallas. Slync maintained two bank accounts: one with Chase Bank (the Chase account) and one with Silicon Valley Bank (the SVB account). Kirchner controlled the Chase account exclusively, while Slync's chief of staff, Tim Kehoe, shared access to the SVB account. Any transfer from the SVB account over $100,000 required joint approval from Kirchner and Kehoe.

During Kirchner's tenure, Slync raised substantial capital through three rounds of stock offerings. In the first, the Series A round, Slync raised $7.2 million from six investors in early 2020. The funds were wired into the SVB account.

After the Series A closed, Kirchner made 27 wire transfers—each below the $100,000 joint-approval threshold—from the SVB account to the Chase account. Once the funds were under his exclusive control, he misappropriated them. Although Kirchner used some of the money for payroll and operations, he diverted most of it to his personal accounts, paying for wine, golf clubs, private jet charters, and personal credit-card debts.

The Series B offering took place in late 2020 and early 2021. This time, Slync raised nearly $50 million from nine investors. To secure those funds, Kirchner made false statements about Slync's revenue and how the new capital would be used, while concealing his prior misuse of the Series A funds. He also omitted key information about Slync's customers and fabricated a bank statement to mislead investors. Once again, the new funds were wired into the SVB account.

No. 24-10644

Kirchner then told Kehoe that he planned to move $20 million of the Series B proceeds to an "investment account." Kehoe approved the transfer—trusting Kirchner's representation—but Kirchner instead diverted the funds to his own bank account. He then spent the money on a private jet, a luxury suite at the Dallas Cowboys' stadium, and a golf-club membership. He also transferred $800,000 of that $20 million to another personal account. Meanwhile, Kirchner continued to siphon funds from the SVB account into the Chase account through wire transfers below the $100,000 threshold, using those funds for additional personal indulgences.

By spring 2022, Slync began missing payroll. During this period, Kirchner—without authorization from Slync's Board—launched what he called the Series C offering. He raised nearly $850,000 from four investors. The investors wired their money directly into the Chase account, and Kirchner then transferred it to the SVB account to cover payroll and other operating expenses.

In May, an investor alerted Slync's CFO that he believed Kirchner was misrepresenting the company's financial performance. The CFO alerted the Board, which confronted Kirchner and, a few weeks later, sought confirmation that payroll had been met. Kirchner produced a document purporting to show payroll had been paid. But Kehoe, who prepared payroll for Kirchner's approval, informed the Board that the report was false. The Board suspended Kirchner on July 24, 2022.

As media reports surfaced about Slync's financial troubles and Kirchner's extravagant spending, the Series C investors demanded repayment. In August 2022, after selling his private jet, Kirchner wired $850,000 from one of his personal accounts back to the Series C investors. Slync terminated Kirchner later that month, shortly before the company was forced to liquidate and permanently shut down.

No. 24-10644

B

Kirchner was charged with four counts of wire fraud and seven counts of money laundering. During trial, the Government's case featured testimony from both Slync investors and employees, as well as analysis from a forensic accountant. Kirchner countered with testimony from his own accountant and also took the stand in his own defense. In addition to the parties' presentation of evidence, the district court posed several questions of its own, which Appellant challenges on appeal.

First, the district court asked venture capitalist Brian Yee a series of clarifying questions about the nature of his investment funds. The court inquired whether the funds Yee invested were primarily his own money or instead derived from pension plans, university endowments, and similar institutional sources. During this questioning, the court observed that such funds ultimately represented the savings of "working mom and pops" and other "ordinary people," referencing sympathetic examples such as non-profit foundations that help underprivileged youth and retirement plans for teachers. The court emphasized that losses in such investments could affect retirees and charitable beneficiaries rather than "wealthy" individual investors.

Next, during Kehoe's testimony, the district court asked whether Kehoe himself had missed paychecks when the company failed to make payroll. When Kehoe responded that he had relied on his military pension and his wife's business income, the court noted that "not everyone had that [luxury]," before briefly returning the questioning to counsel.

The court also interjected during the cross-examination of Slync's CFO, Samar Kamdar. After defense counsel asked about Kamdar's frequent requests to Kirchner for tickets to sporting events, the court added its own commentary: "Sounds like a smart man to me, though, that would request

sports tickets over financials, right?" The court then continued with several lighthearted comments about Kamdar's children and their likely interest in sports before allowing counsel to proceed.

Finally, the district court interrupted Kirchner's own testimony to ask a series of questions about his decision to use company funds to purchase a private jet during the COVID-19 pandemic. The court asked whether the purchase was based on the unavailability of commercial flights, whether Kirchner had considered chartering instead of buying, and whether he understood the corporate structure's role in shielding liability. After the court characterized itself as "not the most sophisticated person" in business matters, it remarked that "$20 million could book a heck of a lot of charter flights." The exchange concluded with the court confirming Kirchner's age, suggesting that he should have known better.

At the conclusion of the trial, the district court provided jury instructions clarifying its role. It also reminded the jury to base the verdict on an independent assessment of the facts. After the jury found Kirchner guilty on all counts, a Presentence Report was prepared. Initially, the PSR calculated Kirchner's Sentencing Guideline range under the fraud Guideline (§ 2B1.1). After the Government objected, the probation office issued an amended PSR that instead applied the money-laundering Guideline (§ 2S1.1). The initial PSR calculated an offense level of 37. The amended version applied § 2S1.1 instead of § 2B1.1 but retained the § 3B1.3 abuse-of-trust enhancement, raising the total offense level to 38. Combined with a loss amount of $71.7 million, the PSR calculated an advisory Guidelines range of 235–293 months.

The district court adopted the amended PSR. It then imposed concurrent sentences of 240 months—the statutory maximum—on the wire-

No. 24-10644

fraud counts and 120 months on the money-laundering counts, followed by three years of supervised release.

Now on appeal, Kirchner asserts a due process challenge based on the district court's questioning of witnesses, as well as a sufficiency-of-the-evidence challenge to his conviction and two sentencing challenges.

## II

We start with whether the district court's questioning of certain witnesses violated Kirchner's Fifth Amendment due process rights. It did not. Specifically, Kirchner contends that the district court's colloquies demonstrated judicial bias; suggested to the jury that the fraud harmed ordinary people and charitable causes; implied sympathy for Slync employees; bolstered the Government's theory of a victimized workforce; enhanced witness credibility by humanizing them before the jury; and signaled disbelief in Kirchner's testimony. When viewed in the context of the trial as a whole, the district court's remarks were limited in scope, and the jury received a curative instruction. Moreover, the evidence against Kirchner was overwhelming, so even if a constitutional error occurred, it was not plain and did not affect his substantial rights.

## A

As a preliminary matter, the parties disagree on the proper standard of review for the district court's questioning. We would ordinarily review for plain error, since Kirchner failed to object below.[1] Yet Kirchner urges that judicial bias constitutes a "structural error" to which plain-error review does not apply. We disagree.

_____

[1] *See United States v. Bree*, 927 F.3d 856, 859 (5th Cir. 2019).

No. 24-10644

"Structural error is constitutional error that 'affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself.'"[2] "If an error is structural, . . . it warrants automatic reversal"—even when the challenge was not preserved.[3] In other words, when structural error occurs, we reverse without analyzing the remaining elements of plain-error review. But automatic reversal on that basis occurs "only in a very limited class of cases."[4]

We have never held that a district court's allegedly biased questioning constitutes structural error,[5] and even Kirchner concedes that we have previously reviewed similar claims of judicial questioning for plain error. We therefore apply plain-error review here.

B

To prevail on plain-error review, Kirchner must show that "(1) the district court erred, (2) the error was plain, (3) the plain error affected his

---

[2] *United States v. Jones*, 935 F.3d 266, 270 (5th Cir. 2019) (per curiam) (quoting *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017) (cleaned up)).

[3] *Id.*

[4] *Neder v. United States*, 527 U.S. 1, 8 (1999) (cleaned up). To be sure, *Neder* included a "biased trial judge" in that limited class. *Id.* (citation omitted). But *Neder* is inapposite. There, the Court cited *Tumey v. Ohio*, which found a due process violation when a mayor with "a direct personal pecuniary interest in convicting the defendant" presided as judge over the defendant's trial. 273 U.S. 510, 523 (1927). The mayor was therefore disqualified. *Id.* at 535. By contrast, Kirchner does not allege such extreme bias here. He does not argue that the district court was inherently biased in a way that infected the entire trial. Instead, he argues that certain *questioning* by the district court unduly influenced the jury. Though a district court's questioning of witnesses can still amount to a constitutional violation, it is not one of the "limited class of [structural-error] cases." *Neder*, 527 U.S. at 8.

[5] *See, e.g.*, *United States v. Perez-Melis*, 882 F.3d 161, 164 (5th Cir. 2018); *United States v. Achobe*, 560 F.3d 259, 271 (5th Cir. 2008); *United States v. Cantu*, 167 F.3d 198, 202 (5th Cir. 1999); *United States v. Saenz*, 134 F.3d 697, 701 (5th Cir. 1998) (per curiam).

substantial rights, and (4) allowing the plain error to stand would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'"[6] Kirchner fails to meet this demanding standard.

The Fifth Amendment's Due Process Clause guarantees that criminal defendants receive "a fair trial in a fair tribunal."[7] We explained in *United States v. Saenz* how that guarantee applies when a district court questions witnesses:

> A trial judge has wide discretion over the tone and tempo of a trial and may elicit further information from a witness if he believes it would benefit the jury. Federal Rule of Evidence 614(b) permits the trial judge to interrogate witnesses, whether called by itself or by a party. In exercising this discretion, the trial court may question witnesses and elicit facts not yet adduced or clarify those previously presented. A judge's questions must be for the purpose of aiding the jury in understanding the testimony. However, the trial court's efforts to move the trial along may not come at the cost of strict impartiality.[8]

*Saenz* instructs us to review a district court's conduct "based on the entire trial record."[9] That means analyzing the judge's comments or questions "in the proper context," "considering factors such as the context of the remark, the person to whom it is directed, and the presence of curative instructions."[10] Likewise, "[t]he number and nature of the court's questions

---

[6] *Bree*, 927 F.3d at 859 (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

[7] *In re Murchison*, 349 U.S. 133, 136 (1955).

[8] *Saenz*, 134 F.3d at 701–02 (cleaned up).

[9] *Id.* at 702.

[10] *Id.* (internal quotation omitted).

are important."[11] Simply put, "[t]o rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor."[12] Even "inadvisable" questions—or those that "clearly helped the prosecution"— do not necessarily violate the Constitution.[13] Only a "substantial" cumulative effect rises to the level of plain error.[14]

The district court's questioning here did not deprive Kirchner of a fair tribunal and rise to the level of plain error. Kirchner identifies four instances of allegedly inappropriate questioning over the course of a four-day trial. Compare this with *Saenz*, where we found a due process violation when the district court's questions constituted roughly 18 percent of the government witness's testimony and 23 percent of the defendant's testimony.[15] That percentage was far smaller here. Kirchner's four-day trial was also considerably longer than the two-day trial in *Saenz*, which provided the district court there a more condensed time period to intervene and therefore set the "tone and tempo" of the trial.[16] Unlike in *Saenz*, the district court occasionally observed "that the lawyers were moving too slowly or wasting time," which justified stepping in to clarify repetitive or confusing testimony

---

[11] *Id.*

[12] *Id.* (quoting *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994)).

[13] *United States v. Sanchez*, 325 F.3d 600, 604, 607–08 (5th Cir. 2003).

[14] *Id.* at 607–08.

[15] *Saenz*, 134 F.3d at 704 n.3; *Cantu*, 167 F.3d at 203 n.22 (discussing *Saenz*'s analysis of the duration of the district court's interruption).

[16] *United States v. Middlebrooks*, 618 F.2d 273, 277 (5th Cir.), *modified on reh'g*, 624 F.2d 36 (5th Cir. 1980) (noting that the trial court's prejudicial comments were "isolated incidents in a four-day trial in which there was ample evidence upon which to convict the defendant").

on both sides.[17] The district court's questioning at issue over the course of four days thus did not approach the prominence necessary to affect Kirchner's substantial rights.

Besides, the district court's interventions sometimes cut against the Government as well. For example, the court explicitly stated it was "going to be giving the defense a lot of leeway"; *sua sponte* curtailed the Government's cross-examinations; accused the Government of testifying and even threatened to hold counsel in contempt; and invited defense counsel to bring an objection. Given these examples of the district court intervening to the Government's detriment, its questioning could not have led the jury to confuse the distinct functions of the judge and prosecutor.[18] These other interventions throughout Kirchner's trial further "blunt[ed] the effect of the complained-of incidents."[19]

Nor were the district court's questions "as extensive or as inherently prejudicial as the trial court's comments and questions in *Saenz*."[20] Whereas the district court's questions in *Saenz* addressed "matters at the heart of the case," the court's questions here instead focused largely on "collateral matters"—such as the potential effect of the fraud on victims, a witness's interest in sports tickets, and Kirchner's reasoning for purchasing a luxury item.[21]

---

[17] *Saenz*, 134 F.3d at 704.

[18] *See id.* at 702.

[19] *Sanchez*, 325 F.3d at 608.

[20] *Id.* (distinguishing *Saenz*).

[21] *See Saenz*, 134 F.3d at 712–13; *Achobe*, 560 F.3d at 272–73 (no plain error where the complained-of comments were not "qualitatively" significant (quoting *Saenz*, 134 F.3d at 702)).

No. 24-10644

In context, the court's interventions were brief in total. The remarks Kirchner challenges—even if "arguably of questionable tone"—"fail[ed] to dominate the lengthy record."[22] They therefore did not "seriously affect the fairness, integrity, or public reputation of the judicial proceeding" and so they cannot rise to the level of plain error.[23]

That the district court also provided jury instructions clarifying its role in the proceedings further weighs against a finding of plain error. We recognized in *United States v. Bermea* that "a curative instruction . . . can operate against a finding of constitutional error."[24] The district court here gave an almost identical instruction:

> You and you alone are the judges of the facts. And by your verdict, you will decide the disputed issues of fact. . . . Nothing the Court may say or do during the course of trial is intended to indicate, nor should be taken by you as indicating what your verdict should be. Your verdict should be based upon your independent assessment of the facts as applied to the law on which the Court instructs you at the conclusion of the case.[25]

The district court further instructed that "[the jurors] should not infer, conclude from any ruling that I make, that I have any opinion whatsoever on

---

[22] *Achobe*, 560 F.3d at 274.

[23] *Id.* (finding no plain error where complained-of district court interventions "fade[d] into total insignificance when read in context").

[24] 30 F.3d at 1571–72.

[25] *Compare with id.* at 1571 (no constitutional error where district judge stated: "Except for my instructions to you on the law, you should disregard anything I may have said or done during the course of the trial, in arriving at your findings as to the facts.").

No. 24-10644

the merits favoring one side or the other."[26] As in *Bermea*, these instructions weigh heavily against a finding of constitutional error.

Finally, any purported error was not plain, nor did it affect Kirchner's substantial rights, because the district court's allegedly misleading questioning was eclipsed by the evidence against Kirchner.[27] Multiple witnesses testified that Kirchner falsified documents and made material misrepresentations.[28] Kirchner himself admitted that he doctored bank records sent to investors and submitted a fake wire transfer to Board members. He also admitted that he transferred $20 million in company funds to a personal account, which he used to purchase luxury items—including a private jet and a suite at the Dallas Cowboys' stadium. This overwhelming evidence amply supports the jury's verdict, and the district court's questions did not predispose the jury to a guilty verdict.[29] Kirchner's case lacks the

---

[26] *Compare with id.* (district judge "instructed the jury not to assume from any of his actions that he had any opinion about the facts of the case").

[27] *See Achobe*, 560 F.3d at 273–74 (district court's "arguably unwise" questioning was not plain error where "significant amounts of evidence were adduced in favor of the government's argument"); *cf. Saenz*, 134 F.3d at 713 (district judge's involvement was prejudicial where there was "relatively scant evidence against [the defendant]").

[28] *See Cantu*, 167 F.3d at 203 (district court's questioning was not plain error where "the government's case against [the defendant] featured numerous substantive witnesses").

[29] *See Saenz*, 134 F.3d at 702. In *Saenz*, we noted that the district court's questioning was especially intrusive because the defendant's guilt hinged on the credibility of *competing* witnesses. *Sanchez*, 325 F.3d at 608 (distinguishing *Saenz*). But here, there were multiple witnesses—including experts—and documentary evidence showing Kirchner's guilt. *Id.*; *see also Perez-Melis*, 882 F.3d at 167–68 (involving a trial that did not hinge on witness credibility—and the district court's questioning did not prejudice the defendant—where "[t]here was evidence other than" the main witness testimony supporting the defendant's guilt); *Cantu*, 167 F.3d at 203 (distinguishing *Saenz* because "rather than resting on the testimony of a single witness, the government's case against [the defendant] featured numerous substantive witnesses"). Of course, witness credibility

No. 24-10644

"unusual combination of circumstances" that might cause biased questioning to outweigh evidence of guilt.[30]

In sum, the district court did not plainly err in its questioning of witnesses. The district court also cured any potential appearance of partiality with its instructions to the jury. And the evidence against Kirchner was so overwhelming that the court's questions could not have unduly influenced the jury. We thus conclude that the district court's questions did not violate Kirchner's Fifth Amendment due process rights.

Although we find no reversible error, we pause to emphasize that judges must always take care to avoid even the appearance of partiality. The line between clarification and advocacy can be thin. Particularly in complex, high-profile criminal trials, extended judicial questioning risks conveying an impression of favoritism. While the district court's interventions here were well-intentioned and aimed at clarifying complex testimony, we nonetheless find it prudent to remind district courts that clarity for the jury is best achieved through neutral phrasing and restraint. Sometimes less is more. After all, the jury—not the court—determines guilt.

## III

We turn next to whether sufficient evidence supports two of Kirchner's wire-fraud convictions: (a) Count 1—the transfer of $60,000 from the Chase account to one of Kirchner's personal accounts, and (b) Count 4—the transfer of $500,000 from the Chase account to another of his

―――――――――――――――――

is important, but it was just one of many pieces of evidence the jury could consider in Kirchner's trial, lessening the salience of the district court's interference.

[30] *Saenz*, 134 F.3d at 699.

13

personal accounts. Because Kirchner did not preserve a sufficiency challenge below, we review for plain error.[31]

To establish wire fraud, the Government must prove: "(1) a scheme to defraud exists, (2) the defendant used wire communications in interstate or foreign commerce *to further that scheme*, and (3) the defendant had specific intent to defraud."[32] The use of the wire "need not be an essential element of the scheme."[33] Even an incidental transmission, or one that serves as a mere "step in the plot," satisfies the statute.[34] And "a scheme to defraud is complete when the persons intended to receive the money . . . receive[] it irrevocably."[35]

Kirchner argues that once the money reached the Chase account—an account over which only he had access and control—the wire fraud was complete. In his view, the subsequent transfers to his personal accounts could not have defrauded investors because the money was already in his possession and moved between accounts exclusively within his control. Because these transfers could not further the scheme, he reasons, the transactions in Counts 1 and 4 cannot constitute wire fraud. We disagree.

---

[31] *See Bree*, 927 F.3d at 859. Ordinarily, we "review challenges to the sufficiency of the evidence de novo, applying the same standard as applied by the district court: could a rational jury find that all elements of the crime were proved beyond a reasonable doubt?" *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017) (citation omitted). But Kirchner concedes that he did not preserve this evidentiary challenge.

[32] *United States v. Davis*, 53 F.4th 833, 842 (5th Cir. 2022) (emphasis added) (quoting *United States v. del Carpio Frescas*, 932 F.3d 324, 329 (5th Cir. 2019) (per curiam)); *see* 18 U.S.C. § 1343.

[33] *United States v. Barraza*, 655 F.3d 375, 383 (5th Cir. 2011) (cleaned up).

[34] *Id.*

[35] *United States v. Fatani*, 125 F.4th 755, 759 (5th Cir. 2025) (internal quotations omitted).

No. 24-10644

Begin with the transfers from the SVB account to the Chase account. Those were not the scheme's final step. It was not until the money reached Kirchner's personal accounts that it *irrevocably* went to the person intended to receive it: Kirchner himself. Though he had exclusive control of the Chase account, money there was still used for legitimate business expenses. The purpose of the scheme was Kirchner's self-enrichment, so the scheme was not complete—and the money did not irrevocably reach him—until he moved the funds into his personal accounts and spent them on luxuries.[36] The transfers from the Chase account to Kirchner's personal accounts were therefore essential to "further th[e] scheme" of defrauding investors for personal gain.[37]

Kirchner also advanced the fraud by deliberately commingling funds among the SVB account, the Chase account, and his personal accounts. This tangled web of transfers masked Slync's true financial condition and obscured Kirchner's diversion of company funds for personal luxuries. Even his own forensic accountant confirmed the scope of the deception: "[Y]ou have money that is going from business accounts, going to personal accounts, back to business accounts. You have personal things being purchased out of business accounts. You've got business expenses being paid out of personal accounts. . . . Clearly, one of the most convoluted and commingled cases I've seen."

To support his argument, Kirchner relies solely on *United States v. Ashley*, where we found insufficient evidence for a wire-fraud charge based

---

[36] *See id.* at 760.

[37] *Davis*, 53 F.4th at 842; *see also Fatani*, 125 F.4th at 760 ("distribut[ing] the proceeds of the scheme to defraud . . . [is] incident to an essential part of the scheme" (internal quotation omitted)).

on transfers from the defendant's business account to his personal account.[38] But Kirchner's case is readily distinguishable. True, we held in *Ashley* that the defendant "'irrevocably' obtained his clients' money for the purposes of the fraud" when funds were transferred to the business account under his exclusive control.[39] But the *Ashley* defendant's scheme stopped there. Unlike Kirchner, the *Ashley* defendant withdrew funds directly from the business account to pay "credit card debts, gambling debts, legal fees, and expenses at casinos, among other bills."[40] Because he "paid for personal and other expenses relevant to the fraud directly from his business account, the money was already available 'for his use' before he transferred the money to his personal account."[41]

Kirchner's conduct was materially different. Despite having exclusive control of the Chase account, he largely avoided making personal purchases directly from it. Kirchner's scheme was far more complex than the *Ashley* defendant's: it involved not just the improper spending of business funds from a business account, but the methodical commingling of funds among business and personal accounts to conceal his fraud from company officials and investors. For Kirchner, the purpose of the scheme—personal enrichment—was not complete until *after* he transferred the money into personal accounts and spent it on extravagant purchases. Those additional transfers were not superfluous; they were the very acts that completed and concealed the scheme, placing the money irrevocably in Kirchner's hands

––––––––––––––––––––––––––

[38] 128 F.4th 641, 648–49 (5th Cir. 2025).

[39] *Id.* at 648.

[40] *Id.* at 649.

[41] *Id.*

and out of reach of Slync and its investors. Unlike the transfers in *Ashley*, these were an essential step in furthering the scheme to defraud.

Our caselaw makes clear that "'acts occurring after the defrauding defendant already controls the proceeds of the fraud' can still further the scheme to defraud, including actions 'taken to avoid detection.'"[42] Here, there was "significant evidence that the scheme to defraud included the concealment of the fraud."[43] Kirchner methodically commingled funds among Slync's two bank accounts and his personal accounts—a tactic designed to obscure his misuse of investor money. If Kirchner had not transferred money out of the Chase account, which also contained legitimate business funds, into accounts used solely for personal spending, "the whole scheme would fall apart."[44] Those additional transfers enabled him both to enjoy the fruits of the fraud and to hide what he had done. A reasonable jury could therefore conclude that Kirchner's transfers from the Chase account to his personal accounts were integral to—and indeed furthered—the scheme to defraud.

Because the subsequent wire transfers from the Chase account to Kirchner's personal accounts were part and parcel of his broader fraudulent scheme, they are sufficient to support the convictions on Counts 1 and 4. Accordingly, no error—let alone plain error—occurred. We therefore AFFIRM Kirchner's convictions.

---

[42] *Fatani*, 125 F.4th at 761 (quoting *United States v. Allen*, 76 F.3d 1348, 1362–63 (5th Cir. 1996)).

[43] *See id.*

[44] *Id.*

No. 24-10644

IV

We next consider whether the district court erred in applying the abuse-of-trust enhancement under the money-laundering Guideline. Here, too, plain-error review applies.[45]

When a defendant is convicted on multiple counts, the Guidelines instruct the district court to group closely related counts and then apply the offense level for the group containing the most serious offense.[46] Here, the two potentially applicable Guidelines were § 2B1.1 (fraud) and § 2S1.1 (money laundering).

On appeal, Kirchner argues that § 2B1.1 (fraud)—*not* § 2S1.1 (money laundering)—was the proper Guideline because, in his view, it carries the most serious offense level. He further contends that the abuse-of-trust enhancement cannot apply to his money-laundering offenses. Specifically, he reasons that when comparing the money-laundering offense level *without* the enhancement (36) to the fraud offense level *with* the enhancement (37), fraud is more serious. Thus, he claims, his offense level should have been calculated under § 2B1.1, producing an overall offense level of 37 rather than the 38 calculated in the amended PSR.

Kirchner's argument fails at the threshold: the abuse-of-trust enhancement can indeed apply to his money-laundering conduct under § 2S1.1. Section 2S1.1 provides that the base offense level for money laundering is the "offense level for the underlying offense from which the

---

[45] *See Bree*, 927 F.3d at 859. Ordinarily, we review sentencing challenges involving the district court's Guidelines application *de novo*. *Davis*, 53 F.4th at 850. But Kirchner concedes that he did not preserve this evidentiary challenge.

[46] U.S. Sent'g Guidelines Manual § 3D1.1–3 (U.S. Sent'g Comm'n 2023).

laundered funds were derived."[47] Here, that underlying offense was fraud, so the base offense level is calculated using § 2B1.1. But Comment 2(C) to § 2S1.1 clarifies that Chapter 3 adjustments—including the § 3B1.3 abuse-of-trust enhancement—"shall be determined based on the offense covered by this [G]uideline"—i.e., the money-laundering Guideline—"and *not* on the underlying offense."[48] Thus, for the enhancement to apply, the abuse of trust must relate to Kirchner's money-laundering conduct, not just to the underlying fraud.

Kirchner argues that any abuse of his position as CEO related only to his fraud and not to money laundering. In his telling, the fraud consisted solely of misrepresentations to investors and coworkers about Slync's finances, while laundering involved only purchases from his personal accounts after the fraud was complete.

But the record refutes that characterization. The fraud and money laundering were all part of a single, integrated scheme, and Kirchner's abuse of his position of trust as CEO was essential to both. The PSR itself defined the scheme as encompassing both offenses:

> Kirchner perpetrated a scheme to defraud Slync and Slync investors out of approximately $71 million, in part, by making false representations and promises about Slync's business operations and financial/revenue status, including by creating false documents to deceive investors about the status of Slync's bank accounts and use of funds; accepting investors' funds initiated based on those false representations; and using investors' funds for private use, such as purchasing a private

---

[47] *Id.* § 2S1.1(a)(1).

[48] *Id.* § 2S1.1, cmt. 2(C) (emphasis added).

jet, residence, vehicles, and jewelry, among other items and uses.

Kirchner abused his position of trust both by deceiving investors and coworkers and by laundering the misappropriated funds for personal use. The money-laundering conduct—using investors' funds to acquire personal luxury items—was itself part of the same fraudulent scheme. The abuse-of-trust enhancement therefore applies equally to both the fraud and the laundering.

Nor does *United States v. del Carpio Frescas* aid Kirchner. There, as here, the offense level was calculated under § 2S1.1 with a § 3B1.3 enhancement, using wire fraud—not money laundering—as the underlying offense.[49] Although we vacated the sentence because the abuse-of-trust enhancement in that case was tied solely to the underlying fraud rather than the laundering, we explicitly recognized that "[i]t is possible that one set of conduct could be relevant for assessing [application of Chapter 3 enhancements] in both a money laundering scheme *and* in the underlying crime that produced the dirty money."[50] That is precisely the situation here. Kirchner's conduct was part of a single, continuous scheme, and his abuse of trust as CEO was integral to both offenses. It is not "out of bounds" to apply § 3B1.1 to the laundering conduct "simply because it *also* applies to the underlying criminal offense [fraud]."[51]

Because Kirchner's fraud and money-laundering conduct were intertwined components of the same scheme, the § 3B1.1 abuse-of-trust enhancement properly applied to both. The district court therefore did not

---

[49] 932 F.3d at 327–28.

[50] *Id.* at 332.

[51] *See id.*

No. 24-10644

err in applying the enhancement when calculating Kirchner's offense level under § 2S1.1.[52] We accordingly AFFIRM Kirchner's sentence.

V

We conclude by considering whether the district court erred in calculating the loss amount by including (1) sales of stock by other investors to third parties and (2) money Kirchner later returned to Slync investors. Again, we review for plain error.[53]

The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."[54] Within that framework,

---

[52] Kirchner's sentencing challenge also fails on plain-error review for a second reason: he cannot show "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quotation omitted). At sentencing, the district court justified Kirchner's sentence based on "all the factors, not only in the [G]uidelines, but also under 18 U.S. Code, Section 3553(a)." The district court, referencing Kirchner's significant theft, emphasized that "even if we didn't have the [G]uidelines or my [G]uideline calculations are later shown to be incorrect, this is still the same sentence that I would have found to be appropriate just under my discretion under *Booker*." Although it is true that "[w]hen a defendant is sentenced under an incorrect Guidelines range . . . the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error," *Molina-Martinez*, 578 U.S. at 198 (quotation omitted), the district court's clear articulation of its reasoning here makes this one of the rare cases where, if the district court had erred in calculating the Guidelines range, that alone would not show a reasonable probability that the outcome would have changed. The district court clarified on the record that Kirchner's sentence would have been the same even if the district court erred in applying the money-laundering Guideline and abuse-of-trust enhancement.

[53] *See Bree*, 927 F.3d at 859. Ordinarily, we review sentencing challenges to the district court's method for calculating losses *de novo*. *United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016). But Kirchner concedes that he did not preserve this evidentiary challenge.

[54] U.S. Sent'g Guidelines Manual § 2B1.1 cmt. 3(A)(i) (U.S. Sent'g Comm'n 2023).

the district court has "wide latitude to determine the amount of loss and should make a reasonable estimate based on available information."[55]

The district court here made a reasonable estimate. For well-supported reasons,[56] the PSR calculated three categories of loss: (1) all funds raised in the funding rounds; (2) investments made by investors exercising their stock-purchase rights; and (3) cofounders' and seed investors' sales of common-stock shares to third-party investors. From these three categories, the district court calculated an overall loss attributed to Kirchner of approximately $71.7 million.

None of Kirchner's objections to the district court's loss calculation move the needle. First, Kirchner challenges the district court's inclusion of stock sales by other investors to third parties. He asserts that nearly $6 million from the third loss category was improperly included because he "had nothing to do with" those transactions. But the record shows that Kirchner's fraud affected these sales. The PSR explained that "third parties also reviewed inflated and false information provided by Kirchner and used that fraudulent data to move forward with transfer agreements." One third-party purchaser, Brian Yee, testified that he relied on financial data and representations from Kirchner when he invested on behalf of ACME

---

[55] *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007).

[56] The reason for including the first category of funds was because, "[h]ad Kirchner not inflated and falsified such information, investors would not have invested in Slync." The second category covered investments made by investors exercising their stock-purchase rights. These were included "because Kirchner continued to provide inflated and false information inducing investors to take such action." The third category contained cofounders' and seed investors' sales of common stock shares to third-party investors. These were included because, "[c]onsistent with Kirchner's ongoing scheme to induce investors to invest in Slync by way of inflated and false information, the third parties also reviewed inflated and false information provided by Kirchner and used that fraudulent data to move forward with transfer agreements."

Capital. The district court thus did not err in including these sales in the loss calculation.

Second, Kirchner argues the district court "count[ed] the same money twice" by including the investors' initial investments (the first loss category) and the stock shares they sold to third parties (the third loss category). In Kirchner's view, the third-party sales were merely transfers of stock and thus did not warrant inclusion in the total loss amount. But it's not clear that including the stock sales was actually double counting. Kirchner has not shown that the money investors contributed initially is the same money that third parties later paid to obtain their stock. And because evidence rebutting the PSR "must consist of more than a defendant's objection" and must be "a demonstration that the information is materially untrue, inaccurate or unreliable," Kirchner fails to show plain error.[57]

Third, Kirchner challenges the district court's inclusion of funds he later returned. He argues that $850,000 from the first loss category—specifically, the money raised in the Series C offering—was improperly included because he returned it to the investors. This argument also falls short. The money-laundering Guideline requires that the amount of loss be reduced for "money returned . . . by the defendant . . . to the victim before the offense was detected."[58] This Guideline defines the time of detection as "the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should

---

[57] *See United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013) (quotation omitted).

[58] U.S. Sent'g Guidelines Manual § 2B1.1 cmt. 3(E)(i) (U.S. Sent'g Comm'n 2023).

have known that the offense was detected or about to be detected by a victim or government agency."[59]

The record shows that Kirchner did not return the $850,000 Series C investments until well after his fraud was detected. In spring and summer of 2022, Slync employees discovered that Kirchner was exaggerating Slync's financial status to investors and the Board. The Board suspended Kirchner on July 24, 2022. That same summer, articles were published about problems at Slync and Kirchner's lavish lifestyle, and investors began demanding the return of their investments. It was not until August 2022 that Kirchner finally repaid the Series C investments. Slync terminated him shortly after.

Nevertheless, Kirchner contends that his return of the investments should be credited because he "repaid the investors during the same month of his firing, but prior to any federal investigation for fraud" and because he was "fired due to his poor performance as CEO, not on account of suspicion of financial crimes." But the record shows otherwise. A Board member testified that Kirchner was suspended and ultimately terminated as CEO "as a result of" the Board learning that he had doctored financial information and presented false wire payments to the Board. Another Board member testified that he sent a letter to Kirchner on July 23, 2022 "informing Chris that due to misrepresentations, public allegations, et cetera, [he] was suspended effective immediately." All this occurred well before Kirchner returned the $850,000.

Because Kirchner unquestionably did not return the $850,000 Series C investments until *after* his fraud was discovered, the district court did not plainly err in declining to credit this amount. We therefore AFFIRM the

---

[59] *Id.*

No. 24-10644

district court's inclusion of both the third-party stock sales and the later-returned investor funds in its loss calculation.

VI

Plain error sets a high bar, and Kirchner fails to clear it. Viewed against the entire trial record, the district court did not plainly err in its limited questioning of witnesses. Kirchner's transfers from the Chase account—over which he alone had control—to his personal accounts furthered his fraudulent scheme, supplying sufficient evidence for wire-fraud convictions on Counts 1 and 4. The district court also correctly applied the abuse-of-trust enhancement because Kirchner's money-laundering and fraud were intertwined strands of a single scheme. And the court properly included both third-party stock sales and later-returned investments in calculating total loss.

Accordingly, we AFFIRM Kirchner's conviction and sentence.